**Billy MCKINNEY, Petitioner–Appellee,**

**v.**

**Christopher ARTUZ, Superintendent, Green Haven Corr. Fac., Respondent–Appellant.**

**Docket No. 01–2739.**

United States Court of Appeals, Second Circuit.

Argued: Sept. 23, 2002.

Decided: April 9, 2003.

Allan N. Taffet (Edward A. White, of counsel), New York, NY, for Petitioner–Appellee.

Ann Bordley, Assistant District Attorney Kings County (Charles J. Hynes, District Attorney, Leonard Joblove, Victor Barall, Assistant District Attorneys, of counsel), Brooklyn, NY, for Respondent–Appellant.

Before: FEINBERG and SACK, Circuit Judges, and MURTHA, District Judge.*

SACK, Circuit Judge.

Respondent–Appellant Christopher Artuz, the Superintendent of Green Haven Correctional Facility in Stormville, New York, appeals from a June 8, 2001, order of the United States District Court for the Eastern District of New York (Nina Gershon, *Judge*) granting Petitioner–Appellee Billy McKinney's application for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. The district court concluded that the state trial court denied McKinney equal protection of the laws by improperly disallowing two of his peremptory challenges to white jurors as race-based under *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), and its progeny. After learning from the State that McKinney's trial counsel had passed away during the eight years since the trial, the district court concluded that reconstruction was not feasible and therefore ordered a new trial.

We conclude that neither the state trial court's denial of the defense's peremptory challenges as race-based, nor the Appellate Division's affirmance of the conviction in the face of a challenge under *Batson,* was

an unreasonable application of the Supreme Court case law controlling habeas review of McKinney's conviction under 28 U.S.C. § 2254(d)(1). We therefore vacate the district court's grant of habeas relief and remand the case to the district court with instructions to enter a judgment denying the application.

## BACKGROUND

In 1992, the defendant was indicted in connection with the death of Mark Frost during an armed robbery on the night of October 18, 1991. The indictment charged McKinney with two counts of second-degree murder, N.Y. Penal Law § 125.25(1),(3), one count each of first- and second-degree robbery, *id.* §§ 160.15(4), 160.10(1), and one count each of second- and third-degree criminal possession of a weapon, *id.* § 265.03 (formerly), § 265.02(4). The State alleged that McKinney and an accomplice took money and jewelry from Frost and another man at gunpoint, and that McKinney then shot Frost as Frost walked away.

### I. State Court Proceedings

McKinney was tried in New York Supreme Court, Kings County, before Justice John Delury in 1993. The only portion of the trial that is relevant to this appeal is the voir dire of prospective jurors. Pertinent excerpts from the transcript are set forth as an appendix to this opinion.

### A. Juror Voir Dire

Jurors were selected for McKinney's trial using a "jury box" system. Under this method, twelve jurors are seated[1] in the jury box for voir dire. After for-cause and peremptory challenges are exercised on

---

* The Honorable J. Garvan Murtha, of the United States District Court for the District of Vermont, sitting by designation.

1. We use the term "seated" here in the literal sense—the jurors each take a seat in the jury box—rather than as a term of art indicating that jurors are selected for trial. And we

the first twelve potential jurors, the court seats additional rounds of twelve in the jury box until twelve jurors and two alternates are selected.

*1. The First Round.* Ten women and two men were called to the jury box; five were white, seven were black.[2] Seven jurors were peremptorily struck. It appears from the record that the prosecution challenged two black women and two white women and that the defense challenged one black woman and three white women.[3]

Neither side asked the other to articulate race-neutral reasons for the chal-

---

sometimes refer to potential jurors as "jurors."

2. We have only limited information about the race of the prospective jurors. By describing the jurors as "black" and "white," we defer to the terminology used by the parties in their appellate briefs and in the trial transcript. Cf. *Hernandez v. New York*, 500 U.S. 352, 355, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991) (plurality opinion) (adopting the term "Latino," used by the parties in their briefs, rather than the term "Hispanic," used by *amicus curiae*, "in deference to the terminology preferred by the parties before the Court"). Our assumptions about the sex of the potential jurors are based on their names.

3. The precise numbers are not entirely clear. In contrast to our inference that McKinney peremptorily challenged one black and three white jurors during the first round, the district court found that all of the jurors that McKinney struck on the first round were white. The district court's source for the jurors' race was the trial court's tally at the end of the second round. The trial court asserted, immediately before denying McKinney's attempt to strike jurors Elefenbaum and Micek on *Batson* grounds in round two, that "the People have excluded four blacks and one white [and the D]efense has excluded six whites and two blacks." (Transcript of Proceedings before Hon. John Delury in New York Supreme Court, Kings County, on Mar. 1–3, 1993, at 129. ("Tr.")) The trial court's tally includes attempted as well as successful strikes. The district court does not say how many blacks it thinks McKinney peremptorily challenged during the second round, but according to McKinney's brief, he challenged only one black juror that round. (The State also does not offer a race tally on the second round, and in fact neglects even to mention the first two jurors challenged by McKinney in the second round.)

From the transcript, we deduce that McKinney's first two challenges on the second round probably included at least one white

juror. This conclusion stems from the fact that after the defense's next two challenges—both to white jurors (Micek and Elefenbaum)—the prosecutor asked for race-neutral reasons based on "a pattern now of him throwing off whites." Tr. at 126. If both of McKinney's first two challenges in the second round had been to black jurors, it seems unlikely that the prosecution would have called the same number of challenges to white jurors "a pattern" moments later. And even if the prosecution might have done so, we think that the defense counsel would likely have mentioned that his previous two challenges had both been to black jurors. Thus, because McKinney apparently challenged only one black juror in the second round, the trial court's tally is consistent with McKinney's assertion in his brief that he challenged three whites and one black in the first round, rather than four whites, as the district court concluded.

The record is made more confusing by the fact that juror number seven in the first round, a white woman, was apparently challenged multiple times—first, for cause by the defense, then peremptorily by the prosecution, and then peremptorily by the defense. The for-cause challenge was denied, but the two peremptories were apparently both permitted. The petitioner's brief thus contends that the court "erroneously noted that the prosecution had excluded four blacks and one white—when, in fact, the prosecution had excluded four blacks and two whites[—and] erroneously concluded or assumed that the defense had peremptorily challenged six whites and two blacks—rather than five whites and two blacks." Pet. Br. at 9–10. But the court did not err in its tally of defense counsel's challenges. Defense counsel did *try* to strike six whites; the fact that he overlooked the prosecution's previous challenge to juror number seven makes the defense's attempt to strike her no less relevant to the court's finding of a pattern of race-based peremptories.

lenges. After the prosecutor made his second and third challenges to black women, however, the court said, "I hope you can give racially neutral reasons to both of those jurors. This is a recurring pattern in Kings County that I don't like." Transcript of Proceedings Before Hon. John Delury in New York Supreme Court, Kings County, on Mar. 1–3, 1993 ("Tr."), at 70. The prosecutor contended that there was no pattern. The following colloquy ensued:

> MR. FARRELL [prosecutor]: In terms of the [New York] Court of Appeals cases, that's not a pattern, challenge for two black jurors out of a ven[ire] full of black jurors is not a pattern. I can strike a white one.
>
> THE COURT: Go ahead. Go ahead.
>
> MR. FARRELL: I'm—
>
> THE COURT: I've heard your pronouncement. Anymore perempts?
>
> MR. FARRELL: Yeah. Number two, Ms. Bucaria.

Tr. at 70. Ms. Bucaria was apparently a white juror. At the conclusion of the first round, five jurors were impaneled: one white and four black.

*2. The Second Round: The Seating of Micek.* Ten women and two men were seated in the jury box for the second round of jury selection. Five were successfully challenged for cause. The prosecution proposed peremptory strikes of two jurors, both apparently black, since the defense asked for a "neutral showing" with respect to them. Tr. at 124. At the court's request, the prosecutor explained that one of them believed he had been wrongfully accused by the police, "framed," and the other had a negative "reaction to witnesses given deals." Tr. at

124–25. The court permitted these two strikes.

The defense's first two peremptory challenges in the second round—apparently to one black juror and one white juror [4]— were granted without objection. The defense's next two peremptories—to Micek and Elefenbaum—met with a *Batson* motion from the prosecution: "Now, Judge, Mr. Miller [defense counsel] raised a race issue, now I'm raising it. I think there is a pattern now of him throwing off whites." Tr. at 126.[5]

The denial of defense counsel's challenge to Elefenbaum is not at issue on this appeal, because Elefenbaum removed herself from the jury the next day. But the following interaction between the court and defense counsel is nonetheless instructive:

> COURT: Number 12 [Elefenbaum], Mr. Miller, what's wrong with that juror? Give me a racially neutral reason why she cannot sit as a juror.
>
> MR. MILLER: She's a legal secretary. From what her answers have been to me, I think that—
>
> THE COURT: Haven't you already accepted legal secretaries as jurors in this case?
>
> MR. MILLER: No.
>
> THE COURT: I believe you have.
>
> MR. MILLER: I don't think there was any.
>
> THE COURT: What do you have to say to that?
>
> MR. FARRELL: Yes, Judge. Juror number two, Ms. Graziano, works for a bankruptcy attorney. She has been a secretary there for a year.
>
> THE COURT: I'm going to seat juror number 12. The mere fact she is em-

---

4. *See supra* note 3.

5. As the district court noted, the transcript incorrectly attributes this statement to the court.

ployed as a secretary, I see no reason why this juror cannot be fair. And having already accepted other jurors employed by attorneys, there is a pattern also, as I see it, on both sides, where the defense is systematically excluding white jurors and the prosecution is systematically excluding black jurors.

I am going to insist on racially neutral reasons for all peremptory challenges. And, if this matter should go to the [New York] Court of Appeals, I think it's high time the Court of Appeals follows the wisdom of Thurgood Marshall[l] and decides all peremptory challenges are intrinsically prejudicial and should be eliminated as an archaic tool for more racist times.

Tr. at 126–27.[6]

After defense counsel described the prosecution's objection to the defense's challenges as "ludicrous," Tr. at 127, and pointed out the presence of some impaneled white jurors, the court moved on to juror number ten, Micek. Defense counsel offered his reasons for the challenge: "An extensive history of criminal cases. He is—his answer to the District Attorney's questions is an indication that I think he's biased in favor of the prosecution. It's a—." Tr. at 127–28. The court interrupted: "What long criminal history does he have?" Tr. at 128. Defense counsel replied, "About four or five criminal cases

that he sat on." *Id.* The prosecutor and defense counsel then argued about how many criminal as opposed to civil trials Micek had sat on. It appears that the prosecutor was correct that Micek had sat on two criminal trials and several civil trials.[7] The court then said, "I don't think that should exclude him. That's not a valid reason to exclude. The only thing left is race." *Id.* The court and defense counsel then discussed the defense's record of peremptories.

After interrupting defense counsel several times, the court stated its position:

— let me finish and don't interrupt. I'm making a ruling.

Once I find that there is no substance to the reason as to being a valid reason to exclude a juror, that is, that he has sat on other jury cases, be it civil or criminal, once I find that that's an invalid reason to exclude, then I must view this as against the defendant a pattern in this case.

Tr. at 129. The court tallied the challenges, finding that the defense had attempted to strike six whites and two blacks and the prosecution had attempted to strike four blacks and one white.[8] The court observed, "There is a pattern on both sides. Maybe there's valid reasons. Maybe there isn't." *Id.* "When I hear a reason that I find invalid," the court con-

**6.** The trial court was apparently referring to Justice Marshall's concurrence in *Batson,* where he expressed his view that the decision "will not end the racial discrimination that peremptories inject into the jury-selection process. That goal can be accomplished only by eliminating peremptory challenges entirely." *Batson,* 476 U.S. at 102–03, 106 S.Ct. 1712 (Marshall, J., concurring).

**7.** The record indicates that Micek had served on the jury of a rape case and a robbery case, as well as "civil stuff that never went to trial." Tr. at 81. The record also indicates that he had been a victim of a mugging involving a

gun approximately ten years earlier. Like the victim in this case, Micek had been accompanied by someone else when it happened. No one was apprehended, although Micek reported it to the police.

**8.** Two of the defense's attempts to strike whites had been denied. And the prosecution had actually struck *two* whites and four blacks; the court was probably forgetting that the prosecution had already struck juror seven when defense counsel challenged her. *See supra* note 3.

tinued, "based upon this track record on two rounds of a voir dire, it's a consistent pattern in Kings County, and I find that there is strong indications of racial overtones." Tr. at 129–30. The court then concluded, "Unless a valid reason can be advanced, I'm going to seat that juror. I'm going to seat jurors ten and 12, over the defense's objection." Tr. at 130.

Defense counsel responded, "Note my exception. I am moving for a mistrial, you[r] Honor." *Id.* The court denied the motion for a mistrial. Defense counsel then said, "I am asking at this time a racially neutral reason for the first two jurors who are available downstairs ...." *Id.* In other words, defense counsel sought to recall jurors previously peremptorily stricken by the prosecution in order to make *Batson* motions challenging the strikes. The court denied that request, observing that "[t]o go back retroactively now is too much of a burden." *Id.* The court repeated its observation of the "recurrent theme in Kings Country on the record that I have observed blatant racism in the selection of jurors on behalf of all sides." Tr. at 131. The court concluded,

> It's high time that jurors are excluded only for cause in Kings County in this state. Peremptory challenges are prejudicial, in my opinion, per se. And I base my opinion and concur whole-heartedly with Thurgood Marshal[l].

> It's time that this problem has been erased from the criminal justice system. The sooner the better.

*Id.* Defense counsel asked, "May I make a record?" And the court replied, "Make it in a brief if you should lose. Not necessary." *Id.*

*3. The Third Round: The Seating of Suture.* On the second day, before the third round of voir dire began, Elefenbaum (whom the defense had tried unsuccessfully to strike) told the court that, although she had thought she had "an open mind," further reflection made her think she could not "really go through with it." Tr. at 135. Whatever the precise meaning of her plea, the court excused her. This brought the total number of jurors impaneled, at the beginning of round three, to seven. It appears that four were black and three were white.

In round three, six men and six women were called to the jury box. The prosecutor made no challenges to jurors number one through five. The defense sought to strike jurors number one (apparently a white woman), two (a white man, Bruce Suture), three (a black man), and five (a man of unknown race).[9] The prosecutor said, "Based on your ruling yesterday, I challenge his challenges and ask the court further to delve further [sic] into the matter of racial exclusion." Tr. at 188. The court allowed the defense's peremptory challenge to juror number one based on "an animosity" between that juror and the defense counsel. *Id.*

Juror number two, Suture, is the second juror whose peremptory challenge is at issue in this appeal. The prosecutor, apparently reading from his notes, described Suture to the court as: "White guy, been on five other criminal cases, cars stolen." Tr. at 189. When asked for a race-neutral reason for the challenge to Suture, defense counsel referred to Suture's experience in "numerous criminal trials" and the experiences of his family members as crime victims.[10] *Id.* After hearing coun-

---

9. The race of jurors two and three is stated in the record. Tr. at 189–90. McKinney asserts in his brief that "[o]nly two of the four jurors were white." Pet. Brief at 11.

10. Although defense counsel spoke of Suture's wife's victimization, emphasizing "[h]is family experiences," Tr. at 189, nothing in the record indicates that Suture's family mem-

ter-arguments from the prosecution, the court concluded, "I see no reason why the juror should not be seated." Tr. at 190. The defense counsel asked to have his exception noted.

After a brief discussion, the trial court permitted the defense's peremptory challenges to jurors number three and five. The court then accepted two further peremptory challenges from the defense, to jurors number six and eight. The court permitted the strike of juror number six because defense counsel "alienated that juror and number one." Tr. at 191. The defense's challenge to juror number eight was permitted by the court, after some discussion, because the juror and his wife were both crime victims. The court first protested that the defense had accepted other jurors who were victims of violent crimes, but defense counsel pointed out that he had been compelled to accept those jurors (Micek and Suture). Jurors number ten, eleven, and twelve were removed for cause, resulting in eleven jurors impaneled at the end of the third round.

*4. The Fourth Round.* After the defense peremptorily struck five jurors and the prosecution one, a twelfth juror and two alternates were seated.

### B. Verdict and Sentence

On April 15, 1993, McKinney was convicted of second-degree murder (felony murder), first-degree robbery, and second-degree criminal possession of a weapon. He was sentenced to concurrent terms of 25 years to life, 12.5 to 25 years, and 5 to 15 years, respectively.

McKinney's accomplice, Steven James, was charged with felony murder, three counts of first-degree robbery, and related lesser offences. James pled guilty to one count of first-degree robbery to satisfy the charges and received a sentence of 5 to 15 years. James testified at McKinney's trial pursuant to a cooperation agreement with the State.

### C. State Appellate Proceedings

McKinney appealed his conviction to the New York Supreme Court, Appellate Division, Second Department. He argued that he was denied his due process right to select a jury when the court disallowed his peremptory challenges to Suture and Micek, and that a supplemental jury instruction on felony murder had violated the prohibition against double jeopardy. By decision and order dated October 10, 1995, a four-judge panel affirmed his conviction, concluding, *inter alia:* "We find no basis in the record to disturb the trial court's determination to seat two prospective jurors after its finding that the defense counsel's explanation for challenging those jurors had a discriminatory intent." *People v. McKinney,* 220 A.D.2d 535, 536, 632 N.Y.S.2d 487, 487 (2d Dep't 1995) (citing *Batson; People v. Allen,* 86 N.Y.2d 101, 629 N.Y.S.2d 1003, 653 N.E.2d 1173 (1995); *People v. Hernandez,* 75 N.Y.2d 350, 552 N.E.2d 621, 553 N.Y.S.2d 85 (1990), *aff'd,* 500 U.S. 352, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991)). McKinney's application for leave to appeal to the New York Court of Appeals was denied by order dated December 28, 1995. *People v. McKinney,* 87 N.Y.2d 904, 641 N.Y.S.2d 234, 663 N.E.2d 1264 (1995) (Smith, *J.*).

---

bers were crime victims. In response to the question of whether any of the jurors had been the victim of a crime, or had a close family member be the victim of a crime, Suture replied, "Two cars, a motorcycle, about two years ago I was on vacation in St. Martin and my car was broken into." Tr. at 147. He reported serving on "at least half a dozen criminal cases," none involving homicide. Tr. at 143. (He reported being an alternate on one of them.) Five of the juries came to a verdict and one hung.

II. Federal Habeas Corpus Proceedings

On April 22, 1997, McKinney filed, *pro se,* his application for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 in the United States District Court for the Eastern District of New York, on essentially the same constitutional grounds he had asserted in his state appeal. On April 18, 2001, the district court (Nina Gershon, *Judge*) granted McKinney's application on the ground that the state trial court's failure to apply properly the *Batson* doctrine violated McKinney's equal protection rights. *McKinney v. Artuz,* No. 97–CV–2059, op. at 18 (S.D.N.Y. Apr. 18, 2001) ("*McKinney I*").[11] The district court based its decision on three determinations: (1) that the trial court placed an improper burden on the defense to produce valid, rather than merely race-neutral, reasons for two of his peremptory challenges to white jurors; (2) that the trial court failed to make explicit rulings on the race-neutrality and credibility of those two peremptories by the defense; and (3) that the trial court improperly rushed the proceedings by refusing to permit defense counsel to make a record about the denial of his attempted strike of one of the jurors. *Id.* at 13–16. The district court concluded that "[a]n unreasonable application of law occurs when the trial court identified the correct principle of law but misapplied it to facts.... That is precisely what occurred in this case." *Id.* at 18 (citing *Williams v. Taylor,* 529 U.S. 362, 120 S.Ct. 1495, 1520, 146 L.Ed.2d 389 (2000)).

The district court directed the State to report on the feasibility of returning the case to the trial court to reconstruct a proper *Batson* hearing. *McKinney I,* op. at 20. The State did so, and also petitioned the court to reconsider its holding in *McKinney I.* The State argued for the first time that the denial of a state statutory right to peremptory strikes was not reviewable in a habeas proceeding because it did not implicate federal constitutional principles. *See McKinney v. Artuz,* No. 97–CV–2059, op. at 1 (S.D.N.Y. June 6, 2001) ("*McKinney II*"). Based on the State's report that the defense counsel had died several years previously, and on the district court's conclusion that the trial court's actions did implicate federal constitutional principles under *Batson,* the district court granted the application for a writ of habeas corpus by order dated June 6, 2001. *McKinney II,* op. at 5.

Respondent appeals.

## DISCUSSION

### I. Standard of Review

We review *de novo* a district court's decision on an application for habeas corpus under 28 U.S.C. § 2254. *Galarza v. Keane,* 252 F.3d 630, 635 (2d Cir.2001); *see also Maldonado v. Scully,* 86 F.3d 32, 35 (2d Cir.1996).

The Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104–132, 110 Stat. 1214 ("AEDPA"), governs habeas applications under section 2254, such as McKinney's, filed after April 24, 1996, the effective date of AEDPA. *See Pavel v. Hollins,* 261 F.3d 210, 215 (2d Cir.2001). Under AEDPA:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—

---

**11.** The district court also concluded that McKinney's double jeopardy claim was without merit, a decision that McKinney has not asked us to review.

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

McKinney asserts that the decisions involved "an unreasonable application of[ ] clearly established federal law[ ] as determined by the Supreme Court," under subsection (d)(1). With respect to such a claim, we have observed that " '[c]learly established Federal law' includes only holdings of Supreme Court decisions and does not include dicta," *Yung v. Walker*, 296 F.3d 129, 135 (2d Cir.2002) (quoting *Williams v. Taylor*, 529 U.S. 362, 412, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000)), and that "[a] petitioner cannot win habeas relief solely by demonstrating that the state court unreasonably applied Second Circuit precedent," *id.*

■ Clearly established federal law, moreover, is law that is "dictated by [Supreme Court] precedent existing at the time the defendant's conviction became final." *Williams v. Taylor*, 529 U.S. 362, 381, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) (quoting *Teague v. Lane*, 489 U.S. 288, 301, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989)) (internal quotation marks omitted). A conviction is final once "the judgment of conviction [has been] rendered, the availability of appeal exhausted, and the time for petition for certiorari ... elapsed." *Teague v. Lane*, 489 U.S. 288, 295, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989) (citation and internal quotation marks omitted); *cf. Clay v. United States*, — U.S. —, 123 S.Ct. 1072, 1076, 155 L.Ed.2d 88 (2003)

(noting the "long-recognized, clear meaning" of "finality" in the postconviction relief context as the time when the Supreme Court "affirms a conviction on the merits on direct review or denies a petition for a writ of certiorari, or when the time for filing a certiorari petition expires").

■ Because McKinney did not file a petition for certiorari seeking review of the New York state-court decisions in the United States Supreme Court, his conviction became final ninety days after December 28, 1995, the date of the order denying his application for leave to appeal to the New York Court of Appeals, *People v. McKinney*, 87 N.Y.2d 904, 641 N.Y.S.2d 234, 663 N.E.2d 1264 (1995) (Smith, J.). *See* Sup.Ct. R. 13(1) ("A petition for a writ of certiorari seeking review of a judgment of a lower state court that is subject to discretionary review by the state court of last resort is timely when it is filed with the Clerk within 90 days after entry of the order denying discretionary review."). We thus evaluate McKinney's application in light of the federal law that was clearly established by the Supreme Court as of March 27, 1996.

## II. Exhaustion of State Remedies

■ The federal statute that governs habeas applications by state prisoners such as McKinney, 28 U.S.C. § 2254, requires a petitioner to exhaust available state-court remedies before seeking federal habeas relief. *Id.* § 2254(b)(1). *Picard v. Connor*, 404 U.S. 270, 275–76, 92 S.Ct. 509, 30 L.Ed.2d 438 (1971); *Daye v. Attorney General of New York*, 696 F.2d 186, 190 (2d Cir.1982) (in banc). To exhaust, the petitioner must "fairly present" his or her federal claims to the state courts, meaning that he or she must put before the appropriate state court "all of the essential factual allegations," *Daye*, 696 F.2d at 191, and "essentially the same legal doctrine,"

*id.* at 192, asserted in the federal petition. A petitioner may fairly present his or her federal constitutional claims "without citing chapter and verse of the Constitution" in any of the following ways: "(a) reliance on pertinent federal cases employing constitutional analysis, (b) reliance on state cases employing constitutional analysis in like fact situations, (c) assertion of the claim in terms so particular as to call to mind a specific right protected by the Constitution, and (d) allegation of a pattern of facts that is well within the mainstream of constitutional litigation." *Id.* at 194.

In this case, McKinney presented to the state courts a claim that the improper denial of his peremptory challenges violated his rights under the Due Process Clause of the Fourteenth Amendment, rather than the Equal Protection Clause upon which he relies in his section 2254 application. But McKinney presented to the state courts the same key facts and essentially the same legal claim of a violation of his rights under *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), and its progeny. He cited pertinent federal cases containing relevant constitutional analysis, including *Batson*, and presented his claim in specific enough terms to "call to mind" the particular constitutional right on which he bases his federal application. We therefore agree with the district court that McKinney exhausted his state-court remedies.

### III. The Three–Step Process of *Batson* and Its Progeny

"More than a century ago, the [Supreme] Court decided that the State denies a black defendant equal protection of the laws when it puts him on trial before a jury from which members of his race have been purposefully excluded." *Batson*, 476 U.S. at 85, 106 S.Ct. 1712 (citing *Strauder v. West Virginia*, 100 U.S. 303, 25 L.Ed. 664 (1880)). In *Batson*, the Court resolved certain evidentiary problems faced by defendants trying to establish racial discrimination in peremptory strikes. The Court rejected the "crippling burden of proof" imposed by *Swain v. Alabama*, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965). *Batson*, 476 U.S. at 92, 106 S.Ct. 1712. Lower courts had interpreted *Swain* to hold "that proof of repeated striking of blacks over a number of cases was necessary to establish a violation of the Equal Protection Clause." *Batson*, 476 U.S. at 92, 106 S.Ct. 1712 (citing cases). Instead, *Batson* held that a defendant can establish a prima facie case of purposeful discrimination by proffering evidence solely from the juror voir dire for his or her trial. *Id.* at 96, 106 S.Ct. 1712.

The *Batson* Court went on to establish a three-step burden-shifting framework for the evidentiary inquiry into whether a peremptory challenge is race-based,[12] *id.* at 96–98, 106 S.Ct. 1712: First, the moving party—i.e., the party challenging the other party's attempted peremptory strike—must make a prima facie case that the nonmoving party's peremptory is based on race. *Batson*, 476 U.S. at 96–97, 106 S.Ct. 1712; *Hernandez v. New York*, 500 U.S. 352, 358, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991). Second, the nonmoving party must assert a race-neutral reason for the peremptory challenge. *Batson*, 476 U.S. at 97–98, 106 S.Ct. 1712;

---

12. Although *Batson* discussed only the prosecutor's peremptory challenges, *see Batson*, 476 U.S. at 89 n. 12, 106 S.Ct. 1712, the *Batson* framework applies to peremptories by both parties. *See Georgia v. McCollum*, 505 U.S. 42, 46, 112 S.Ct. 2348, 120 L.Ed.2d 33 (1992) (answering in the affirmative the question, reserved in *Batson*, of "whether the Constitution prohibits a *criminal defendant* from engaging in purposeful racial discrimination in the exercise of peremptory challenges" (emphasis added)).

*Hernandez,* 500 U.S. at 358–59, 111 S.Ct. 1859. The nonmoving party's burden at step two is very low. Under *Purkett v. Elem,* 514 U.S. 765, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995) (per curiam), although a race-neutral reason must be given, it need not be persuasive or even plausible. *Id.* at 768, 115 S.Ct. 1769. Finally, the court must determine whether the moving party carried the burden of showing by a preponderance of the evidence that the peremptory challenge at issue was based on race. *Batson,* 476 U.S. at 96, 98, 106 S.Ct. 1712; *Hernandez,* 500 U.S. at 359, 111 S.Ct. 1859.

■ Throughout the three *Batson* steps, the burden remains with the moving party: "It is not until the *third* step that the persuasiveness of the justification becomes relevant—the step in which the trial court determines whether the opponent of the strike has carried his burden of proving purposeful discrimination." *Purkett,* 514 U.S. at 768, 115 S.Ct. 1769 (emphasis in the original). Thus, "[i]n the typical peremptory challenge inquiry, the decisive question will be whether counsel's race-neutral explanation for a peremptory challenge should be believed." *Hernandez,* 500 U.S. at 365, 111 S.Ct. 1859. Because the evidence on this issue is often vague or ambiguous, "the best evidence often will be the demeanor of the attorney who exercises the challenge." *Id.* Thus, "evaluation of the [striking attorney's] state of mind based on [his or her] demeanor and credibility lies 'peculiarly within a trial judge's province.'" *Id.* (quoting *Wainwright v. Witt,* 469 U.S. 412, 428, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985)).

IV.  The State Courts' Application of *Batson*

The State argues that because there is no federal constitutional right to peremptory challenges, the denial of a defendant's peremptory challenges could not provide a basis for federal habeas relief. Because we find no violation of this defendant's rights under "clearly established Federal law[ ] as determined by the Supreme Court" within the meaning of section 2254(d)(1), we do not reach the question of whether the denial of a defendant's peremptory challenges can ever be the basis for habeas relief.

We conclude that the state courts at the various stages of this case did not misapply controlling Supreme Court precedent. Rather, the trial court applied the three-step process established in *Batson* and its progeny in a reasonable manner in light of the Supreme Court precedent at the time McKinney's conviction became final, and similarly, the Appellate Division acted reasonably in affirming McKinney's conviction with respect to his *Batson* claim.

A.  The Trial Court's Application of *Batson*'s Three–Step Process

*Batson*'s step one is not at issue here. The Supreme Court has held that the prima facie case of discriminatory intent becomes irrelevant to the analysis of a peremptory challenge once the trial court proceeds to the second and third steps as it did here. *See Hernandez,* 500 U.S. at 359, 111 S.Ct. 1859 ("Once [the nonmoving party] has offered a race-neutral explanation for the peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the [moving party] had made a prima facie showing becomes moot.")

■ As required under step two, the trial court sought race-neutral reasons for the defense's peremptory .challenges to both Micek and Suture, the two jurors whose challenges are at issue here. With regard to Suture, the court expressly requested "a racially neutral reason" for de-

fense counsel's challenge. Tr. at 189. With regard to Micek, the trial court began the inquiry into defense counsel's reasons for the challenge simply by saying "Let's go to juror ten [Micek]." Tr. at 127. Three aspects of the transcript make it clear that the trial court was asking for a race-neutral explanation for the attempt to strike Micek. First, the court had just expressly requested "a racially neutral reason" for the defense's attempt to strike another juror, Elefenbaum. Tr. at 126. Second, moments earlier the court had articulated its suspicion that the attorneys on both sides were making race-based peremptory challenges, explaining that it therefore intended to "insist on racially neutral reasons for all peremptory challenges." Tr. at 127. Third, defense counsel must have understood the court to be requesting a race-neutral reason because he proceeded to offer one. Thus, the trial court met the requirements of *Batson*'s step two by eliciting race-neutral reasons from defense counsel.

■ The trial court also fulfilled the requirements of *Batson*'s step three by ruling on the ultimate credibility of defense counsel's race-neutral reasons and thereby determining whether his challenges to Micek and Suture were race-based. In analyzing the defense's attempt to strike Micek, the court ruled that it was "going to seat [Micek], over the defense's objection." Tr. at 130. We note that the court made clear its reasoning for this decision, although we are aware of no controlling Supreme Court precedent that required it to do so. The court expressly pointed to three kinds of evidence that indicated that the challenge to Micek was race-based: (1) a countywide pattern of

racially motivated challenges by both prosecutors and defense attorneys; (2) a pattern of race-related attempts to strike by the defense as well as the prosecution in this particular case; and (3) the fact that defense counsel's proffered reason for the challenge was "not a valid reason to exclude." Tr. at 128.

In addition to its express reasons, the court had before it further information on which to base its denial of the peremptory challenges as race-based. The prosecution had highlighted for the court the doubtfulness and imprecision of defense counsel's race-neutral reason for challenging Micek. Defense counsel had asserted that Micek had sat on "[a]bout four or five criminal cases," Tr. at 128, when in fact, as the prosecution pointed out, Micek had sat on only two criminal cases and several civil cases. And defense counsel's comments when attempting to strike Elefenbaum may have diminished his credibility.[13] The trial court was in a position to observe the demeanor of the defense counsel, something the court might have been reflecting in its statement that it found "strong indications of racial overtones." Tr. at 130. As the Supreme Court noted in *Hernandez*, "the best evidence often will be the demeanor of the attorney who exercises the challenge." 500 U.S. at 365, 111 S.Ct. 1859.

The trial court gave no explanation for its decision to seat Suture, merely delivering its ruling as follows: "I see no reason why the juror should not be seated." Tr. at 190. In light of the court's earlier comment that, because of the evidence of race-based challenges before it, it was forced to find a challenge to be race-based if the race-neutral reason offered is not

---

**13.** In response to the court's request for a race-neutral reason, defense counsel stated that Elefenbaum was a legal secretary. After defense counsel told the judge that no other legal secretaries had been accepted, the prosecution undermined defense counsel by pointing out that a legal secretary had already been seated. *See supra* text accompanying note 6.

"valid," Tr. at 129–30,[14] with these words the court was clearly making a ruling on the credibility of defense counsel. By saying that it saw no reason for the juror not to be seated, the court was saying that it found the defense's reason to be pretextual. Although reviewing courts might have preferred the trial court to provide express reasons for each credibility determination, no clearly established federal law required the trial court to do so.

In addition, two of the reasons the court had offered earlier in voir dire, when it rejected the attempted strike of Micek, may also apply to its conclusion with respect to Suture: the pattern the court perceived in the county and in this case. And the court invited the prosecution to respond to the challenge, and made its ruling just after the prosecution offered its arguments against the attempted strike. Thus, the court apparently found that the prosecution carried its burden of showing pretext.

Furthermore, as the prosecution's comments imply, defense counsel again misrepresented the record when explaining his race-neutral reasons for his attempt to strike Suture. Defense counsel repeatedly cited the experience of Suture and others in his family—or perhaps *only* the others in his family—as crime victims.[15] Although Suture himself had been a victim of crime, nothing in the record suggests that his family members were crime victims. Finally, Suture had expressed some views favorable to the defense. For instance, when asked by defense counsel whether a cooperating witness who had not yet been sentenced was less credible, Suture responded, "I would think so. Since it's obviously to his benefit to deliver something to the District Attorney." Tr. at 165.[16] Thus, in addition to the trial court's perception of a countywide and trial-specific pattern and its observation of defense counsel's demeanor, the court had material before it from which to disbelieve defense counsel and to conclude that his race-neutral reasons were pretextual and thus that the attempt to strike was motivated by race.

■ The Supreme Court has instructed us to accord "great deference" to the trial court's findings in this context. *Batson*, 476 U.S. at 98 n. 21, 106 S.Ct. 1712. And the Court has observed that the "evalua-

---

14. Once I find that there is no substance to the reason as to being a valid reason to exclude a juror, that is, that he has sat on other jury cases, be it civil or criminal, once I find that that's a[n] invalid reason to exclude, then I must view this as against the defendant a pattern in this case. . . .

When I hear a reason that I find invalid, based upon this track record on two rounds of a voir dire, it's a consistent pattern in Kings County, and I find that there is strong indications of racial overtones.

Unless a valid reason can be advanced, I'm going to seat that juror.

Tr. at 129–30.

15. It is unclear whether defense counsel was arguing that Suture's family members—to the exclusion of Suture himself—had been crime victims. Defense counsel began by saying that Suture "has been the victim of many—his family has been a victim, his wife has been a victim." Tr. at 189. The references to Suture's "family" and "his wife" could be read to revise the initial, partial statement that Suture himself was a crime victim. This interpretation is supported by defense counsel's final sentence explaining his race-neutral reasons for attempting to strike Suture: "His family experiences are of such and his background is of such I don't believe the defendant can get a fair trial." *Id.*

16. In response to a general question from the prosecution about whether a cooperating witness could ever tell the truth, Suture replied, "His credibility is greatly diminished. Put it that way. But it doesn't remove the possibility of his telling the truth. You know. It works both ways, that possibility." Tr. at 155–56.

tion of the [striking attorney's] state of mind based on demeanor and credibility lies 'peculiarly within a trial judge's province.'" *Hernandez,* 500 U.S. at 365, 111 S.Ct. 1859 (internal citation omitted). In the context of a habeas application from a state prisoner such as McKinney, "a determination of a factual issue made by a State court shall be presumed to be correct," 28 U.S.C. § 2254(e)(1), and the petitioner bears the burden of rebutting the presumption by clear and convincing evidence, *id. See Morris v. Reynolds,* 264 F.3d 38, 45 (2d Cir.2001), *cert. denied,* 536 U.S. 915, 122 S.Ct. 2381, 153 L.Ed.2d 199 (2002). In light of the deferential standard appropriate to *Batson* inquiries under clearly established federal law and to habeas review under section 2254(e)(1), we conclude that the trial court's denial of the defense's attempted strikes of Micek and Suture was not "a decision that ... involved an unreasonable application of[ ] clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1). And thus, the Appellate Division's decision to affirm the trial court's rulings was similarly not unreasonable. *See People v. McKinney,* 220 A.D.2d 535, 536, 632 N.Y.S.2d 487, 487 (2d Dep't 1995) ("We find no basis in the record to disturb the trial court's determination to seat two prospective jurors after its finding that the defense counsel's explanation for challenging those jurors had a discriminatory intent.").

## B. *The Errors Found by the District Court*

The district court concluded that the trial court had engaged in an unreasonable application of *Batson* and its progeny.

First, the district court concluded that the trial court failed to make explicit rulings on the race-neutrality (step two), and the credibility (step three), of defense counsel's reasons for attempting to strike Micek and Suture. We disagree.

The trial court did make express rulings at step three of the *Batson* inquiry, and it was not required by the controlling law to make express rulings at step two. For step three of the analysis with respect to the challenge to Micek, the court said, "I'm going to seat juror[ ] ten ..., over the defense's objection." Tr. at 130. For step three of the Suture inquiry, the court said, "I see no reason why the juror should not be seated." Tr. at 190. In the context of the trial court's comments throughout voir dire, as discussed above, we understand these to be statements that the trial court found defense counsel's race-neutral reasons for attempting to strike Micek and Suture to be pretextual and therefore found the challenges to be racially motivated. Because we think that the trial court made an express ruling at step three, we need not and do not decide whether clearly established Supreme Court precedent required the court to do so in this case. *Cf. Jordan v. Lefevre,* 206 F.3d 196, 200 (2d Cir.2000) (interpreting our decision in *Barnes v. Anderson,* 202 F.3d 150, 156–57 (2d Cir.1999), to "h[o]ld it was error for the trial court to deny a *Batson* motion without explicitly adjudicating the credibility of the non-moving or challenging party's race neutral explanations for its action in peremptorily striking potential jurors").

As for findings at step two, race neutrality, we know of no relevant Supreme Court holding that a trial court must make such an express ruling. Indeed, among the controlling Supreme Court cases, we find no clear indication that the trial courts under review ever made express rulings on race-neutrality at step two. *See, e.g., Purkett,* 514 U.S. at 766, 115 S.Ct. 1769 ("The state trial court, without explanation, overruled respondent's objection and empaneled the jury.");

*see also id.* at 771, 115 S.Ct. 1769 (Stevens, J., dissenting) ("The prosecutor ... did volunteer an explanation [for his strikes], but the judge evaluated neither its credibility nor its sufficiency." (footnote omitted)); *Hernandez,* 500 U.S. at 357 n. 2, 358, 111 S.Ct. 1859 ("The trial judge appears to have accepted the prosecutor's reasoning as to his motivation."; "After further interchange among the judge and attorneys, the trial court again rejected petitioner's claim.").[17] We therefore conclude that the trial court's failure to make an express ruling at step two was not an unreasonable application of clearly established federal law as determined by the Supreme Court. *See Yung,* 296 F.3d at 135.

■ Second, the district court decided that the trial court impermissibly required defense counsel to provide "a 'valid' reason with 'substance' for his peremptory challenges instead of a merely race-neutral reason." *McKinney I,* op. at 13. In support of its view, the district court quoted *Purkett,* 514 U.S. 765, 115 S.Ct. 1769, 131 L.Ed.2d 834, for the proposition that "[the trial court] erred by 'combining the second and third steps into one, requiring that the justification tendered at the second step be not just neutral but also at least minimally persuasive, i.e., a "plausible" basis for believing that "the person's ability to perform his or her duties as a juror" will be affected.'" *McKinney I,* op. at 13 (quoting *Purkett,* 514 U.S. at 768, 115 S.Ct. 1769).

But *Purkett* does not bar a trial court from finding an implausible race-neutral reason to be incredible and therefore pretextual. In *Purkett,* the state trial court had permitted the prosecutor to strike a juror, over the defendant's objection, although the prosecutor's race-neutral reasons were implausible. 514 U.S. at 766, 115 S.Ct. 1769. Reversing the district court, the Eighth Circuit granted habeas relief to the defendant on the basis that the prosecutor's race-neutral reasons were insufficient as a matter of law. *Id.* at 767, 115 S.Ct. 1769 (citing *Elem v. Purkett,* 25 F.3d 679, 683 (8th Cir.1994)). The Supreme Court reversed the Court of Appeals, favoring the trial court's acceptance of the prosecution's race-neutral reasons for the strike, even though those reasons were implausible. *Id.* at 768–69, 115 S.Ct. 1769. Thus, the Supreme Court held only that an appellate court could not reverse a conviction on the grounds that race-neutral reasons given at step two were not persuasive or plausible. In the case at bar, by contrast, the trial court granted the *Batson* motions contesting the attempted strikes, after seeking race-neutral reasons

---

**17.** The district court cites two Second Circuit cases to support its finding that the trial court erred by failing to make an express ruling at steps two and three. *See United States v. Alvarado,* 923 F.2d 253 (2d Cir.1991); *Barnes v. Anderson,* 202 F.3d 150, 156–57 (2d Cir. 1999). As noted above, a state court's failure to abide by the decisions of a federal court of appeals does not alone provide a sufficient basis for granting habeas relief from a state conviction under section 2254. *Yung,* 296 F.3d at 135. Moreover, neither *Alvarado* nor *Barnes* held that a trial court could not deny a peremptory challenge as race-based without making an express ruling about the race-neutral explanations at step two. Both decisions base their holding on an analysis of step three. *See Alvarado,* 923 F.2d at 256 (remanding for the trial court to make findings as to the prosecutor's intent with respect to two jurors, where the trial court expressly accepted the race-neutral explanations given by the prosecution for striking two jurors but also permitted the strikes of two other jurors without making any findings with respect to the latter two jurors); *Barnes,* 202 F.3d at 157 (holding that a trial court's "explicit refusal to rule on the credibility of either attorney's explanation" when denying a *Batson* motion contesting a peremptory strike violates "the court's duty under the third step of *Batson* ").

and plainly finding the proffered reasons to be pretextual. The trial court in this case merged steps two and three, but only to the extent that it did not make an express ruling at step two, which it was not required do. This is entirely consistent with *Purkett*, which recognized that, at the third stage, "implausible or fantastic justifications may (and probably will) be found to be pretexts for purposeful discrimination." *Id.* at 768, 115 S.Ct. 1769.

Nor did the trial court request more than race-neutral reasons for the peremptory challenges. As described above, the court made clear that what it was seeking was race-neutral reasons. The court then proceeded to explain how it evaluated the proffered reasons at step three—i.e., if the reasons did not seem case related, then, in light of all the evidence before it, the trial court was going to deny the contested challenges as race-based. The court thus seems to have conducted what was, in essence, a credibility determination, deciding that if the reasons were not persuasive, then the reasons must be pretextual in light of "the totality of the relevant facts." *Hernandez*, 500 U.S. at 363, 111 S.Ct. 1859 (internal quotation marks and citation omitted). No controlling Supreme Court authority dictates otherwise.

▋ Finally, the district court found that the trial court improperly rushed the *Batson* inquiries. As the district court correctly noted, this Court has " 'disapproved of [a] trial court conducting its review of a *Batson* application with undue haste and ruling in a summary fashion.' " *McKinney I*, op. at 15 (quoting *Jordan*, 206 F.3d at 200). But the district court cites only Second Circuit precedent for the

idea that rushing the *Batson* inquiry may be impermissible under the *Batson* line of cases, and we are aware of no Supreme Court decision to that effect. Because no Supreme Court decision at the time of McKinney's conviction held that rushing the inquiry was a violation of *Batson*, haste would be an insufficient basis for granting habeas relief in this case. *See Yung*, 296 F.3d at 135.[18]

We also doubt the district court's reading of the transcript with respect to the trial court's haste. The district court was apparently most troubled by the trial court's response to defense counsel's request to make a record at the end of the second round of voir dire: "Make it in a brief if you should lose. Not necessary." Tr. at 131. The district court read the trial court to be responding to a request from defense counsel to "make a record regarding the challenge to Mr. Micek." *McKinney I*, op. at 16. But our reading of the transcript convinces us that defense counsel's then most recent request was not his attempt to strike Micek; it was his request that the court call back two jurors who had been peremptorily struck earlier by the prosecution, so that the defense could raise belated *Batson* motions contesting the prosecution's strikes. The trial court understandably and reasonably rejected this request to turn back the clock, observing that "[t]o go back retroactively now is too much of a burden." Tr. at 130.

We therefore conclude that the trial court's decisions with respect to McKinney's attempted strikes, and the Appellate Division's decision to affirm with respect to them, were not unreasonable applications of the Supreme Court decisions controlling

18. Moreover, it is not clear that, under our decision in *Jordan*, rushing alone would be enough to violate *Batson*. In *Jordan*, we found that the trial court not only "resisted counsel's efforts to make arguments regard-

ing the peremptory strikes so as to create a full record," 206 F.3d at 201, but "made no effort to comply with the letter, much less the spirit, of *Batson*," *id.*

this case. McKinney's section 2254 application should therefore have been denied.

## CONCLUSION

We vacate the judgment of the district court granting the application for a writ of habeas corpus, and remand the case with instructions to enter judgment denying the application.

## APPENDIX

The following is a portion of the transcript of the voir dire of potential jurors.

THE COURT: ... Mr. Miller, ten and 12, for cause?

MR. MILLER: No. None for cause.

THE COURT: Perempt, People?

MR. FARRELL: No.

THE COURT: Defense?

MR. MILLER: Defense on both.

[FARRELL [19]]: Now, Judge, Mr. Miller raised a race issue, now I'm raising it. I think there is a pattern now of him throwing off whites.

Just as he asked me for my race neutral reasons, I would ask you to ask him.

THE COURT: Number 12, Mr. Miller, what's wrong with that juror? Give me a racially neutral reason why she cannot sit as a juror.

MR. MILLER: She's a legal secretary. From what her answers have been to me, I think that—

THE COURT: Haven't you already accepted legal secretaries as jurors in this case?

MR. MILLER: No.

THE COURT: I believe you have.

MR. MILLER: I don't think there was any.

THE COURT: What do you have to say to that?

MR. FARRELL: Yes, Judge. Juror number two, Ms. Graziano, works for a bankruptcy attorney. She has been a secretary there for a year.

THE COURT: I'm going to seat juror number 12. The mere fact she is employed as a secretary, I see no reason why this juror cannot be fair. And having already accepted other jurors employed by attorneys, there is a pattern also, as I see it, on both sides, where the defense is systematically excluding white jurors and the prosecution is systematically excluding black jurors.

I am going to insist on racially neutral reasons for all peremptory challenges. And, if this matter should go to the Court of Appeals, I think it's high time the Court of Appeals follows the wisdom of Thurgood Marshal and decides all peremptory challenges are intrinsically prejudicial and should be eliminated as an archaic tool for more racist times.

MR. MILLER: With all due respect, I think this District Attorney is ludicrous. Ms. Seymour is white. The foreman is white.

THE COURT: Let's go to juror ten.

MR. MILLER: An extensive history of criminal cases. He is—his answer to the District Attorney's questions is an indication that I think he's biased in favor of the prosecution. It's a—

THE COURT: What long criminal history does he have?

MR. MILLER: About four or five criminal cases that he sat on.

MR. FARRELL: Or two, Judge.

MR. MILLER: He has more than two.

19. The transcript incorrectly attributes this line to the court, as the district court noted.

MR. FARRELL: He said he sat on a rape, a robbery and several civil case.

MR. MILLER: At least three to four criminal cases that I heard him say he sat on.

THE COURT: I don't think that should exclude him. That's not a valid reason to exclude. The only thing left is race.

MR. MILLER: It's not his race, your Honor. There's several white people—may I indicate, your Honor, that again here, for the record, my challenges again to the entire—

THE COURT: I understand. You don't like women. I understand that.

MR. MILLER: There or only two males chosen. Now that I exercised—

THE COURT: I'm afraid by logic I am drawn to no other conclusion, once I find that a reason is not a valid reason—

MR. MILLER: It's a perfect—

THE COURT: —let me finish and don't interrupt. I'm making a ruling.

Once I find that there is no substance to the reason as to being a valid reason to exclude a juror, that is, that he has sat on other jury cases, be it civil or criminal, once I find that that's a invalid reason to exclude, then I must view this as against the defendant a pattern in this case. And the pattern in this case—I will pause for a second to bring my score up to date—

MR. MILLER: I would like—

THE COURT: Just a second. That means I will pause in silence.

(Pause.)

THE COURT: The pattern of the last two juror selections the People have excluded four blacks and one white.

Defense has excluded six whites and two blacks. There is a pattern on both sides. Maybe there's valid reasons. Maybe there isn't.

When I hear a reason that I find invalid, based upon this track record on two rounds of a voir dire, it's a consistent pattern in Kings County, and I find that there is strong indications of racial overtones.

Unless a valid reason can be advanced, I'm going to seat that juror.

I'm going to seat jurors ten and 12, over the defense's objection.

MR. MILLER: Note my exception. I am moving for a mistrial, you Honor.

THE COURT: Denied.

MR. MILLER: I am asking at this time a racially neutral reason for the first two jurors who are available downstairs in the—

THE COURT: No. I will review this pattern as it arose.

I brought up the issue on the first round. You sat mute and decided to go about using your peremptory challenges in what appeared to me also to be a racial way.

To go back retroactively now is too much of a burden. I will face these issues as they are raised. I gave you the signal and you chose not to accept it.

From now on, it's not by the boards. You brought up the issue, Mr. Miller, and I am facing it.

I'm not going back to get jurors from a previous round. Denied.

Bring the jurors in.

Once again, it is a recurrent theme in Kings County on the record that I have observed blatant racism in the selection of jurors on behalf of all sides.

It's high time that jurors are excluded only for cause in Kings County in this state. Peremptory challenges are prejudicial, in my opinion, per se. And I base my opinion and concur whole-heartedly with Thurgood Marshal.

It's time that this problem has been erased from the criminal justice system. The sooner the better.

MR. MILLER: May I make a record?

THE COURT: Make it in a brief if you should lose. Not necessary.

(Tr. 125/22—131/22.)

* * *

THE COURT: Okay. 1 through 5, for cause, by the People?

MR. FARRELL: None.

THE COURT: For cause, by the defense?

MR. MILLER: None.

THE COURT: Perempt, by the People?

MR. FARRELL: None.

THE COURT: No perempts by the People. By the defense?

MR. MILLER: One, two, three and five.

MR. FARRELL: Based on your ruling yesterday, I challenge his challenges and ask the court further to delve further into the matter of racial exclusion.

THE COURT: Well, I think that what developed in the voir dire is an animosity between juror number one and defense counsel.

So I will allow that one to stand.

Number two? Whose two?

MR. FARRELL: Mr. Suture.

MR. MILLER: Mr. Suture.

MR. FARRELL: White guy, been on five other criminal cases, cars stolen.

THE COURT: Give me a racially neutral reason.

MR. MILLER: He has been the victim of many—his family has been a victim, his wife has been a victim. He has been in numerous criminal trials.

I believe that a situation such as this, it is my personal opinion, that he would be prejudiced against defendants in this situation.

His family experiences are of such and his background is of such I don't believe the defendant can get a fair trial.

THE COURT: Do you care to respond?

MR. FARRELL: My notes indicate he said he had two cars and a motorcycle stolen. I don't think those are the same kind of traumatic experiences that would prejudice him against this defendant.

Certainly, nothing was elicited on the record by Mr. Miller that it would.

The fact that he has been a criminal juror before on many occasions, if anything, I think cuts toward the fact that he was a fair and impartial juror.

THE COURT: I see no reason why the juror should not be seated.

MR. MILLER: Note my exception.

THE COURT: It's noted.

(Tr. 188/6—190/8.)