Derrick Lesean LEWIS, Petitioner–
Appellant,

v.

Gail LEWIS, Deputy Warden,
Respondent–Appellee.

No. 01–56927.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Dec. 2, 2002.

Filed Feb. 28, 2003.

Jerald L. Brainin, Los Angeles, CA, for the petitioner-appellant.

Marc E. Turchin, Deputy Attorney General, Los Angeles, CA, for the respondent-appellee.

* The Honorable William W Schwarzer, Senior District Judge for the Northern District of California, sitting by designation.

Before: D.W. NELSON and T.G. NELSON, Circuit Judges, and SCHWARZER,* District Judge.

## OPINION

T.G. NELSON, Circuit Judge.

Derrick Lesean Lewis appeals the district court's denial of his habeas corpus petition. We have jurisdiction pursuant to 28 U.S.C. § 2253. During jury selection before his state court trial for murder, Lewis alleged that race motivated the prosecutor's peremptory strike of an African American member of the jury venire in violation of his constitutional rights as articulated in *Batson v. Kentucky.*[1] The state trial court rejected Lewis's *Batson* motion, and the state appellate court affirmed. We conclude that the California Court of Appeal unreasonably applied law clearly established by the Supreme Court.[2] Therefore, we reverse with instructions to grant the writ.

### I.

The State of California charged Lewis with murder in connection with a gang-related killing in Santa Barbara. A twelve-member jury convicted Lewis, and he is currently serving a sentence of nineteen years to life. The jury selection process—in particular, the prosecutor's use of a peremptory strike to remove one of two African–Americans in the jury pool during the selection of alternate jurors—is at issue in this case. Lewis claims that the trial court improperly rejected his challenge of the prosecutor's strike, and that the appellate court compounded the trial court's error.

1. 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).

2. *See* 28 U.S.C. § 2254(d).

When jury selection began, two African Americans were in the jury pool. One was impaneled on the jury; the other, whom we shall refer to as "D.F.," remained in the pool from which the court selected alternates.

During voir dire, D.F. stated that she was married, that her husband was an engineer, that they had one child, and that she worked as a testing supervisor. The prosecutor asked her for whom she worked, and she said Raytheon. When asked if she or anyone in her family had a law enforcement background, D.F. responded: "Not background, but I have a niece that's a nurse officer and a nephew that's a jailer." She also indicated that she did not discuss her relatives' work with them.[3] D.F. subsequently stated that one of her relatives was employed locally, and one worked in San Luis. The prosecutor did not ask at what facilities her relatives were employed, and the information never came to light.

The prosecutor struck D.F. Defense counsel objected to the strike as improperly motivated by race, citing *People v. Wheeler*,[4] the California analogue to *Batson v. Kentucky*.[5] The trial court concluded that counsel had established a prima facie *Batson/Wheeler* violation. Accordingly, the court required that the prosecutor describe his reasons for striking D.F.

The prosecutor offered the following explanations for his strike:

This particular situation, in view of the fact that there is ... in fact one juror who's black who's been left after inquiry, I think, first of all, indicates that there's not systematic exclusions of people who are members of a cognizable group, which would include African Americans.

No.2, this particular case, this juror indicated, I believe, through the answer that she gave, a disinterest in law enforcement issues by her response concerning her, I think it was a nephew and niece.

I felt that it was difficult to have somebody who potentially had information from the jail. I can't recall which one of those persons was involved in law enforcement at the Department of Corrections here, the jail situation, where I've had a lot of contacts myself. Law enforcement has gone out there on numerous occasions. And I felt that her association with the jail itself might cause

---

3.  Later, the prosecutor followed up on D.F.'s response, and the two had the following exchange:

[By the prosecutor:]
Q. [Y]ou mentioned that, I think you said your nephew and niece were involved in some law enforcement things. And [defense counsel] asked you if you discussed, you know, their work with them, and you said—you said no. But you also said it was in a way that I don't want to talk about it. Is that because it's basically kind of boring?
A. Would you think that's interesting conversation?
Q. To tell the you the truth, no. But—
A. No, I—no.
Q. Okay. You just know that's what they do and—
A. Yeah. That's their job.

4.  22 Cal.3d 258, 148 Cal.Rptr. 890, 583 P.2d 748 (Cal.1978).

5.  476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). Aspects of *Batson* and *Wheeler* differed somewhat, especially with respect to the requirements for establishing a prima facie case of discrimination, at the time of Lewis's trial. *See Wade v. Terhune*, 202 F.3d 1190, 1197 (9th Cir.2000) (holding that application of the *Wheeler* standard as to the prima facie case does not satisfy *Batson* and that the *Batson* standard constitutes clearly established federal law). The parties do not dispute the prima facie element of Wheeler/Batson, however. Moreover, the federal standard is clearly established law, so where there is a conflict and federal law imposes a higher standard, a court's actions must be judged against the *Batson* standard. *Id.*

issues, because I'm having protective orders on various witnesses, et cetera.

. . . .

Additionally, because, tell you the truth, because she's African American, and I was unsure who she was, I watched her relatively closely from the moment she came in the courtroom. And I did that because of security issues we've discussed, I think both on and off the record concerning this case.[6] I wasn't sure of her association with any of the defendants.

So in watching her it was my belief that she didn't relate and interact with other potential jurors in a way that would be the type of mix that I would like, as opposed to the other African American juror who I also watched for the same reason, who appeared to be much more social, to interact with other jurors in a way which would . . . be more open to discussing it with the other jurors and coming back to some[ ]type of conclusion which would be one I would hope would be unanimous on behalf of all.

As a fifth reason, the prosecutor stated that he had questions about precisely what D.F.'s job entailed. He said he "wrote a question mark" by her job title, "which was indicating to me I wasn't sure what that was in terms of a job. And I thought the fact that her employment was, as my notes to myself indicate, questionable, that that type of factor did not bode in her favor."

Finally, as a sixth reason, the prosecutor noted that, although he didn't think D.F. was "overwhelmingly pro or con in terms of the voir dire toward me or [defense counsel]," he thought that defense counsel

must have thought so because he "referred to his own client" by D.F.'s last name on his last peremptory challenge. The prosecutor explained, "I assume whether that's a Freudian slip or not, that would tend to indicate something about [defense counsel's] attitude toward that juror."

After listening to the prosecutor's arguments, the court stated that:

The arguments—some of the arguments are not convincing. But the argument with respect to the jail, that's probably a reasonable kind of—even though you don't know which one of the two, both of them would obviously work in the jail, either the nurse or the nephew who's a correctional officer. We don't know which one. But both of them—they would be working any place but the jail.

When defense counsel tried to interject, describing weaknesses in the record with respect to the reason the court had cited, the court ended the inquiry and denied the *Batson/Wheeler* motion.

On appeal, the California Court of Appeal found that, in addition to the prosecutor's argument regarding D.F.'s possible connection to the jail, another reason supported the trial court's denial of the *Batson/Wheeler* motion. It found that "the prosecutor's concern that [D.] F. did not appear to relate to other jurors in a way that was conducive to reaching a verdict was by itself a legitimate reason for the challenge." Citing *People v. Turner*,[7] the appellate court also stated that the fact that "the jury included another African–American is an indication of the prosecutor's good faith."

---

6. The transcript includes a discussion of the presence of a uniformed Santa Barbara police officer who was there "for security," presumably because of the gang-related nature of the crime.

7. 8 Cal.4th 137, 32 Cal.Rptr.2d 762, 878 P.2d 521 (Cal.1994).

After exhausting his remedies on direct and on state collateral appeal, Lewis filed the instant federal petition. The district court denied his petition on all grounds. With respect to the *Batson* challenge, the court found that Lewis had failed to meet his "burden of rebutting the presumption of correctness which applies to the State courts' finding of discriminatory intent ... by clear and convincing evidence." The court concluded that Lewis had failed to proffer any evidence that the two reasons for the prosecutor's strike on which the California Court of Appeal relied were a pretext for racial discrimination. Thus, the district court dismissed the petition. Lewis appealed. This court granted a certificate of appealability solely as to the *Batson* issue.

## II.

■■■ We review de novo the district court's denial of Lewis's § 2254 petition.[8] Under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), we must determine "whether the state court decision was erroneous."[9] If it was, we must then decide if the error meets AEDPA's standards for reversal.[10] AEDPA allows reversal only when a state court decision is:

(1) ... contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.[11]

This highly deferential standard requires us to presume that "state courts know and follow the law."[12] Moreover, it requires us to presume that state courts' factual findings are correct, absent clear and convincing evidence to the contrary.[13]

In this case, the appellate court's decision is the last reasoned decision, and is thus the decision we must review.[14] Because that decision affirmed the trial court and adopted one of the reasons cited by the trial court, however, our analysis will necessarily include discussion of the trial court's decision as well.

We conclude that the appellate court committed constitutional error. We also conclude that the error warrants the grant of the writ under AEDPA because the court unreasonably applied clearly established federal law as determined by the Supreme Court.[15] Therefore, we reverse with instructions to grant the writ.

To explain the basis of our decision fully and to follow the requirements of *Van Tran v. Lindsey*,[16] we will first discuss

---

**8.** *Killian v. Poole*, 282 F.3d 1204, 1207 (9th Cir.), *pet. for cert. filed*, 71 U.S.L.W. 3352 (U.S. Oct. 30, 2002) (No. 02–637).

**9.** *Van Tran v. Lindsey*, 212 F.3d 1143, 1155 (9th Cir.2000).

**10.** *Id.*

**11.** 28 U.S.C. § 2254(d).

**12.** *Woodford v. Visciotti*, —— U.S. ——, 123 S.Ct. 357, 360, 154 L.Ed.2d 279 (2002).

**13.** *Bragg v. Galaza*, 242 F.3d 1082, 1087, *amended by* 253 F.3d 1150 (9th Cir.2001).

**14.** *Benson v. Terhune*, 304 F.3d 874, 880 n. 5 (9th Cir.2002).

**15.** *Williams v. Taylor*, 529 U.S. 362, 407–09, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000).

**16.** 212 F.3d at 1155 (adopting the Supreme Court's approach in *Weeks v. Angelone*, 528 U.S. 225, 120 S.Ct. 727, 145 L.Ed.2d 727 (2000), in which "the Court first addressed the question whether the state court decision was erroneous and then, on the basis of its answer, concluded that AEDPA barred relief, rather than asking initially whether the state court decision was unreasonable under [AEDPA]").

ideal procedures under *Batson* and its progeny, including precedent from this Circuit. We will then examine the California trial court's dramatic divergence from those ideal procedures. Then, we will discuss the problems with the California Court of Appeal's affirmance of the trial court. Thus, we will first establish that the state courts committed constitutional error. Next, we will analyze the state courts' actions in light of clearly established law as determined by the Supreme Court to decide whether the error warrants the grant of the writ of habeas corpus under AEDPA's deferential standard.[17]

## III.

### A. *Ideal Procedures Under* Batson

Ideally, a trial court faced with a *Batson* challenge undertakes a clearly-delineated three-step inquiry. We address the first two steps of this inquiry only briefly here, because this case involves the third step.

■■■ In the first step, a court facing a *Batson* challenge must determine whether the defendant has successfully made a prima facie showing of purposeful discrimination.[18] If the defendant has done so, the court must then proceed to the second step of the inquiry. In this step, "the burden shifts to the State to come forward with a neutral explanation for challenging" the jurors.[19] Thus, the court must listen to the prosecutor's proffered reasons for the strike and determine whether they are "a neutral explanation related to the particular case to be tried."[20] During step two, "the issue is the facial validity of the prosecutor's explanation. Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race-neutral."[21]

■■■ It is in the third step, the step at issue in this case, that the court reaches the real meat of a *Batson* challenge. In the third step, the court has "the duty to determine if the defendant has established purposeful discrimination."[22] To fulfill its duty, the court must evaluate the prosecutor's proffered reasons. "A finding of discriminatory intent turns largely on the court's evaluation of the prosecutor's credibility."[23] As with any credibility finding, the court's own observations are of paramount importance.[24] Other factors come into play in a court's evaluation of a prosecutor's reasons as well, however. For example, if a review of the record undermines the prosecutor's stated reasons, or many of the proffered reasons, the reasons may be deemed a pretext for racial discrimination. Similarly, a comparative analysis of the struck juror with empaneled jurors "is a well-established tool for exploring the possibility that facially race-

---

17. *See Early v. Packer*, —— U.S. ——, 123 S.Ct. 362, 366, 154 L.Ed.2d 263 (2002) (stating that, to warrant habeas relief under AEDPA, a decision must not only be erroneous but also "an *unreasonable* application of clearly established federal law") (internal quotation marks omitted).

18. *See Batson*, 476 U.S. at 96–97, 106 S.Ct. 1712; *McClain v. Prunty*, 217 F.3d 1209, 1219–20 (9th Cir.2000).

19. *Batson*, 476 U.S. at 97, 106 S.Ct. 1712; *see also McClain*, 217 F.3d at 1220.

20. *Batson*, 476 U.S. at 98, 106 S.Ct. 1712.

21. *McClain*, 217 F.3d at 1220 (internal quotation marks omitted).

22. *Batson*, 476 U.S. at 98, 106 S.Ct. 1712.

23. *McClain*, 217 F.3d at 1220.

24. *Batson*, 476 U.S. at 98 n. 21, 106 S.Ct. 1712. For this reason, reviewing courts "give th[e]se findings great deference." *Id.See also Hayes v. Woodford*, 301 F.3d 1054, 1081–82 (9th Cir.2002).

neutral reasons are a pretext for discrimination."[25] After analyzing each of the prosecutor's proffered reasons, our precedent suggests that the court should then step back and evaluate all of the reasons together. The proffer of various faulty reasons and only one or two otherwise adequate reasons, may undermine the prosecutor's credibility to such an extent that a court should sustain a *Batson* challenge.[26]

A court may enlist the help of counsel in order to evaluate "the totality of the relevant facts" thoroughly.[27] Particularly when afforded the opportunity to review a transcript of the jury selection proceedings, defense counsel may be able to point to weaknesses in the prosecutor's proffered reasons demonstrated by the record. Similarly, the prosecutor may be able to show support in the record for the proffered reasons, thereby strengthening the reasons.

Thus, a court engaging in the third step of *Batson* has various tools at its disposal in order to fulfill its duty to determine whether purposeful discrimination has occurred. In an ideal setting, a court would use most, if not all, of these tools in evaluating a *Batson* motion.

### B.  *The Trial Court*

The trial court in this case dramatically departed from the ideal, three-step inquiry outlined above.[28] Only the third step of the inquiry is at issue in this case, so we address that step alone. As to that step, the trial court's statement and actions are very troubling. The court stated:

> The arguments—some of the arguments are not convincing. But the argument with respect to the jail, that's probably a reasonable kind of—even though you don't know which one of the two, both of them would obviously work in the jail, either the nurse or the nephew who's a correctional officer. We don't know which one. But both of them—they would be working any place but the jail.

Thus, the trial court rejected an unspecified number of the prosecutor's reasons, thereby suggesting that its evaluation of the prosecutor's credibility was not very high. The court then conducted an abbreviated analysis of the record support for the prosecutor's third reason,[29] saying that

---

**25.**  *Turner v. Marshall,* 121 F.3d 1248, 1251–52 (9th Cir.1997).

**26.**  *See, e.g., United States v. Chinchilla,* 874 F.2d 695, 698–99 (9th Cir.1989) (reversing trial court's finding of no discrimination where prosecutor gave one good reason and one bad reason for each strike).

**27.**  *McClain,* 217 F.3d at 1220. One can argue that a court must allow defense counsel to present argument during the step-three inquiry, unless the record clearly shows that a decision in the defendant's favor is warranted. After all, the defendant bears the ultimate burden of persuasion, *see Batson,* 476 U.S. at 98, 106 S.Ct. 1712, and has only been allowed to establish a prima facie case before step three. However, this argument appears not to have been addressed by courts. Certainly, requiring a court to allow defense counsel to argue is not clearly established law. Nonetheless, it seems wise for courts to allow

counsel to argue, if only to remove some of the burden of record evaluation from the court.

**28.**  Indeed, it seems the court either skipped the second step entirely in this case or confused it with the third step. After the prosecutor offered his reasons for the strike, the court asked defense counsel if he had anything to say and began discussing possible remedies under *Batson.* Then, it made the statement set forth below, rejecting some of the prosecutor's reasons and concluding that one was probably reasonable. Finally, it denied the motion over defendant's attempts to argue that the record did not support the stated reason.

**29.**  The third reason, as stated by the prosecutor, was as follows:

> I felt that it was difficult to have somebody who potentially had information from the

a relative worked in the jail, but it was unclear which one. It then said, however, that "they would be working any place but the jail." Accordingly, the court offered a conflicting description of its recollection of the record support for the prosecutor's third reason. It then offered the following equivocal statement, which sounds more like the analysis required in *Batson* step two than in step three, that "the argument with respect to the jail" was "probably ... reasonable." Finally, the court declined to listen to defense counsel's argument and denied the Batson/*Wheeler* motion.

■ Although AEDPA requires us to begin with the presumption that the trial court knows and follows the law,[30] the trial court's statements and actions lead us to conclude that the court never fulfilled its affirmative duty to determine if the defendant had established purposeful discrimination. The court's statements regarding the invalidity of some of the prosecutor's reasons suggests that the court's evaluation of the prosecutor's credibility was low. Its abbreviated review of the record produced results that were equivocal at best, and contradictory at worst. Moreover, as discussed below, a thorough evaluation of the record reveals serious problems with the prosecutor's third reason. Finally, the court's statement that the third reason was "probably ... reasonable," the statement it made just before denying the *Batson* motion, does not reassure us. During Batson's third step, the court has an affirmative duty to determine if purposeful discrimination occurred. Concluding that one

of many of the prosecutor's reasons, after noting that little or no record support for it exists, is "probably ... reasonable" simply does not fulfill such a duty.

## C. *The Appellate Court*

■ The appellate court did not rectify the trial court's failure to conduct a proper step-three inquiry. Unlike a trial court, a court of appeal is not in an ideal position to conduct a step three evaluation. It can, however, use the trial court's findings and the evidence on the record to evaluate the support on the record for the prosecutor's reasons and credibility, and to compare the struck and empaneled jurors. The California Court of Appeal did not do so. If it had done so, the following problems would have come to light.

First, contrary to the prosecutor's statement, only a possibility existed that one of D.F.'s relatives worked in the jail.[31] The prosecutor never asked D.F. whether her relatives worked in the jail. One of her relatives *may* have worked in that facility; however, the possibility existed that both of her relatives worked in other facilities. Moreover, D.F. stated that she did not discuss her relatives' work with them, making the possibility that she would receive information about the witnesses held in the jail even more remote.

Second, a comparative analysis of D.F. with empaneled jurors reveals that a finding of pretext was warranted.[32] Two other jurors had potential connections to the jail that were at least as close, if not closer,

---

jail. I can't recall which one of those persons was involved in law enforcement at the Department of Corrections here, the jail situation, where I've had a lot of contacts myself. Law enforcement has gone out there on numerous occasions. And I felt that her association with the jail itself might cause issues, because I'm having protective orders on various witnesses, et cetera.

30. *Woodford,* —— U.S. at ——, 123 S.Ct. at 360.

31. The California Court of Appeal noted this problem but went no further.

32. *See McClain,* 217 F.3d at 1220–21; *Turner,* 121 F.3d at 1251–54.

than D.F.'s potential connection. Juror Number 28 had once worked in the Santa Barbara Police Department and knew three of the witnesses. Juror Number 73 had once worked at Juvenile Hall and knew several witnesses who had been housed there during his tenure. Moreover, he was working as a probation assistant at the time of jury selection and may well have had connections with the jail. The prosecutor struck neither juror.

Third, the trial court's rejection of at least two or three [33] of the prosecutor's proffered reasons militated against concluding that D.F.'s potential connection to the jail defeated the defendant's motion. In *United States v. Chinchilla,*[34] we reversed a trial court's finding that two prosecutorial strikes were not discriminatory.[35] Although the prosecutor had offered valid reasons for both strikes, we concluded that the fact that he had also offered reasons that did "not hold up under judicial scrutiny" undermined his credibility such that the trial court's finding was unwarranted.[36] In this case, the trial court determined that the prosecutor offered several reasons that did not hold up under scrutiny, and cited only one that was "probably" reasonable. Thus, the argument for pretext in this case is stronger than the argument in *Chinchilla.*

Accordingly, had the appellate court attempted to remedy the trial court's error in its step-three analysis, it would have found serious problems with the trial court's reliance on D.F.'s potential connection to the jail and with the trial court's conclusion. Although the court of appeal adopted the trial court's reason for denying the motion, it may have recognized the weakness of the reason as it cited a new reason as an alternative ground to affirm. As we shall see, that reason is even more problematic.

As an alternative ground for affirming, the court of appeal stated that "the prosecutor's concern that [D.]F. did not appear to relate to other jurors in a way that was conducive to reaching a verdict was by itself a legitimate reason for the challenge." Courts have found that a "loner" personality justifies a preemptive strike.[37] However, three problems exist with the appellate court's reliance on that reason in this context.

█ First, the trial court did not specify which reasons it rejected. Accordingly, it may have rejected the reason on which the appellate court relied. We simply do not know—and neither did the appellate court. Second, we question whether the prosecutor's explanation of the reason on which the appellate court relied may be considered race neutral. Although the ultimate conclusion that D.F. was a "loner" could provide a race neutral reason for striking her, the prosecutor's stated method of gathering the information leading to that conclusion was—even according to the prosecutor himself—not race neutral. Finally, the new reason on which the appellate court relied depends entirely on the prosecutor's credibility. No support for the prosecutor's claim that D.F. failed to interact well with other jurors, save the prosecutor's own statement, exists on the record. Thus, in order to accept that reason, the court of appeal had to deem the

33. We interpret the word "some" in the trial court's statement that it found "some" of the prosecutor's reasons not to be convincing, to mean at least two or three.

34. 874 F.2d 695.

35. *Id.* at 698–99.

36. *Id.* at 699.

37. *See United States v. Daly,* 974 F.2d 1215, 1219 (9th Cir.1992).

prosecutor credible, a factual determination that is uniquely the province of the trial court.[38]

The trial court did not find the prosecutor credible. If anything, the trial court's findings belie such a conclusion. Shortly after hearing the prosecutor's reasons, the trial court stated that "some of the [prosecutor's] arguments" were "not convincing." This finding does not support the prosecutor's credibility; it undermines it. The court then offered its contradictory statement regarding the prosecutor's third reason and said that the reason was "probably ... reasonable."[39] Moreover, as discussed above, the record further undermines the prosecutor's credibility.

Nothing changed between the time of the trial court's evaluation and the appellate court's evaluation to improve the prosecutor's credibility. Moreover, the appellate court owed deference to the trial court's findings. Accordingly, the appellate court's reliance on a new reason that depended entirely on the court's evaluation of the prosecutor's credibility, did not cure the step-three problems inherent in the case; it merely compounded the problems.

For the foregoing reasons, we conclude that the California Court of Appeal committed constitutional error in its decision affirming the trial court's denial of the Batson/Wheeler motion. We must now determine whether that error warrants the grant of the writ under AEDPA.[40]

## IV.

■ Batson protects the right of a defendant to be tried by a jury, the selection of which does not violate the Equal Protection Clause, as well as the right of citizens to be evaluated for jury service without being discriminated against based on impermissible characteristics, such as race.[41] The court's task in step three of a Batson challenge, its duty to determine whether the defendant has established purposeful discrimination, lies at the heart of Batson.

■ A court faced with a Batson challenge need not follow every detail of the ideal, step-three analysis set forth above in order to conduct a constitutionally permissible analysis. It need not use all of the tools for evaluating the validity of a prosecutor's reasons that are available to it.[42] In order for Batson to have any meaning, however, a court faced with a Batson challenge must, at a minimum, fulfill its duty to determine whether the defendant has established purposeful discrimination. It is the California courts' failure to fulfill this basic duty that leads us to order the petition granted in this case.

The trial court did not conduct a meaningful step-three analysis, and the limited analysis in which it did engage pointed towards sustaining, not denying, the Batson motion. The court rejected some of the prosecutor's reasons, offered a conflict-

---

**38.** See Hayes, 301 F.3d at 1081–82.

**39.** Neither does the fact that the prosecutor had not struck the only other African–American on the jury venire justify the appellate court's decision. Although this fact is quite relevant at the first step of the Batson inquiry, and courts have held that it is a sign of good faith on the part of the prosecutor, it does not alone support an affirmative credibility finding. See Turner, 121 F.3d at 1254.

**40.** Early, —— U.S. at ——, 123 S.Ct. at 366.

**41.** Batson, 476 U.S. at 85–87, 106 S.Ct. 1712. In addition, Batson is designed to protect society, whose members' faith in the judicial system will falter in the face of an illegally discriminatory jury selection. Id. at 87, 106 S.Ct. 1712.

**42.** Indeed, some of the precedent cited above is not law that has been clearly established by the Supreme Court. See, e.g., Chinchilla, 874 F.2d at 698–99.

ing analysis of the record support for the prosecutor's third reason, and found only that the reason was "probably . . . reasonable." The record warrants a finding of pretext as to the reason cited by the trial court.

The appellate court did not attempt to rectify the trial court's failure to engage in a proper, step-three analysis. Instead, it adopted the problematic reason on which the trial court relied and cited a new, even more problematic reason, as an alternative ground for affirming. In addition to the fact that the trial court may have rejected the alternative reason adopted by the appellate court, the second reason depended entirely on the prosecutor's credibility. The record and the trial court's findings undermined the prosecutor's credibility.

In light of the trial court's findings undermining the prosecutor's credibility, and the remainder of the record, we are at a loss to cite any reason that could justify the appellate court's decision. The court of appeal identified the best, alternative reason for affirming offered by the prosecutor; however, for the reasons set forth above, that reason cannot withstand scrutiny. Accordingly, we cannot say that the appellate court's decision is, although different from the decision we would make were we in its position, "at least reasonable." [43]

Under clearly established law set forth by the Supreme Court in *Batson*, courts have an affirmative duty under the third step of *Batson* to determine whether purposeful discrimination has occurred. The California courts never fulfilled this duty. Accordingly, the decision of the California Court of Appeal represents an "unreason-

able application of[ ] clearly established federal law, as determined by the Supreme Court." [44] Thus, we reverse with instructions to grant the petition unless the state, within a time to be established by the district court, elects to re-try petitioner.

REVERSED WITH INSTRUCTIONS.

---

43. *Early,* —— U.S. at ——, 123 S.Ct. at 366; see also *Woodford,* —— U.S. at ——, 123 S.Ct. at 361.

44. 28 U.S.C. § 2254(d)(1).

