Darnell DEBERRY, Petitioner,

v.

Leonard A. PORTUONDO, Respondent.

No. 98 Civ. 3323 (LBS)(CP).

United States District Court,
E.D. New York.

June 12, 2003.

### MEMORANDUM AND ORDER

SAND, District Judge.*

Petitioner Darnell DeBerry ("Petitioner") seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254, alleging that the trial court erred in its interpretation and application of *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). For the reasons stated below, this Court denies the petition.

**BACKGROUND**

#### I. State Court Proceedings

In 1992, DeBerry, who is African American, and a codefendant, Eric Jeffrey, were charged with one count of second degree murder and two counts of criminal possession of a weapon. Jury selection in their trial started on March 21, 1994.

The trial judge used a jury box system for selecting jurors. *See McKinney v. Artuz*, 326 F.3d 87 (2d Cir.2003) (explaining the jury box system). Under this system, a group of prospective jurors is seated in the jury box for voir dire. After questioning by the trial judge and the attorneys is complete, the trial judge asks both parties whether there are any challenges for cause to the entire panel. After the court rules on the parties' for-cause challenges, peremptory challenges are then exercised on the remaining venirepersons. Those persons remaining after both sides exercise their peremptory challenges become members of the jury, and another round begins with a fresh group of prospective jurors seated in the jury box. The process is repeated until twelve jurors and the required number of alternate jurors are selected.

## A. First Round

At the beginning of voir dire in DeBerry's trial, twelve jurors from the venire took seats in the jury box.[1] (Transcript of Proceedings before Hon. Edward K. Pincus, Supreme Court of New York, Kings County, 3/22/94 ("Tr."), at 44.) Following voir dire and the excuse of one juror for cause, the prosecutor exercised three peremptory challenges to the remaining eleven jurors. From later discussions during voir dire, it appears that the prosecutor used all three peremptory challenges to strike black jurors. (Tr. 72.) The defense then exercised four challenges, thus resulting in the selection of four jurors after the first round.

## B. Second Round

Sixteen jurors were seated in the box at the start of the second round. (Tr. 78.) The voir dire from this second group of jurors is not recorded,[2] and the next recorded stage in the proceedings is the beginning of the for-cause challenges to the entire panel, which at this point consisted of fourteen jurors in the sixteen seats.[3] The trial judge granted the prosecutor's motion to dismiss two jurors for cause (Jurors Nine and Thirteen) and denied the defense counsel's challenge for cause to Juror Fourteen. (Tr. 68–71.) Therefore, twelve jurors remained available for selection immediately prior to both parties' exercise of peremptory challenges.

Discussions surrounding the *Batson* challenges by both parties during the second round give a picture of the racial composition of this group of twelve jurors. The prosecutor exercised four peremptory strikes, and the defense exercised six peremptory strikes on this group. Jurors One and Two were seated; the defense attorney later identified both as white females. (Tr. 79.) In his two *Batson* challenges, the defense attorney asserted that all four of the prosecutor's strikes affected black jurors. (Tr. 72.) In his own *Batson* motion following the defense attorneys' use of their peremptory challenges in the second round, the prosecutor alleged that the defendant exercised all of his strikes against white jurors (Jurors Four, Six, Ten, Twelve, Fourteen, and Sixteen). (Tr. 79–80.) The defense did not dispute this characterization, though he does identify at least one of these stricken jurors as Hispanic. (Tr. 79.) Thus, of the twelve jurors remaining, it appears that four jurors were black and eight jurors were either white or Hispanic.

The peremptory challenges in the second round proceeded in two stages. The court clerk first asked for the prosecution's peremptory challenges to the eight remaining jurors in the first ten seats. (Tr. 71.) The prosecutor struck three of the eight jurors: Jurors Three, Seven, and Eight. After the prosecutor exercised these strikes, the defense made a *Batson* motion: "Judge, I am going to make an application at this time, challenges the People challenge pursuant to Batson. Every challenge the People have taken first round and in this round have been individuals who are black and I see a pattern

---

1. The Court will use the term "jurors" to refer to potential jurors as well.

2. For reasons neither the Respondent nor the trial judge were able to explain, substantial portions of the voir dire were not recorded. (*E.g.*, Tr. 68, 81.)

3. The jurors in seats Five and Fifteen are never mentioned in any recorded point of the proceedings. Presumably, they were either absent or excused at some earlier, unrecorded point in the voir dire. (*See* Tr. 81 (listing names of twelve excused and two seated jurors).)

forming of challenging black jurors even though they have left some on." (Tr. 72.)

After briefly questioning the defense attorney, the trial judge requested that the prosecutor articulate a race-neutral reason for his first challenge:

THE COURT: I think out of twelve people on the first round they challenged only three and I believe we do have black jurors and you didn't raise it then.

MR. SHEINBERG [Co–Defendant's Counsel]: I wouldn't raise it the first challenge.

THE COURT: This round all three of them.

MR. SHEINBERG: All three are black.

THE COURT: Okay, juror three, why did you challenge three?

MR. KERN [The Prosecutor]: I challenged him because I believe what he said but I just wasn't comfortable having someone 20 years old judging somebody of similar age. We do have a lot of young people on the panel and I kept some young people and knocked some young people off. I kept Ms. Thomlin, and I kept Ms. McQuillan as juror number one. No challenge Ms. Madden. I don't like young people.

(Tr. 72–73.)

After some discussion, the trial judge accepted the prosecutor's explanation: "Mr. Archibald did say something that caught the Court's ear, he did say that being young he could relate to them and I find that inappropriate [sic] challenge."[4] (Tr. 74.)

The trial judge then requested explanations for the peremptory challenges to Jurors Seven and Eight:

MR. SHEINBERG: All right, how about Ms. Smith?

MR. KERN: Are you requiring me to give neutral reasons even though—

THE COURT: Well if they are three black people this round, I didn't take note on the last round.

MR. SHEINBERG: I checked them.

THE COURT: Rather than waste time, I will ask to have the reason now.

MR. KERN: Number seven, Judge, there is some aspect of her background, particularly the fact she is in law enforcement but after consultation with Ms. Kelly, Ms. Kelly stated and I agree, that this person struck her as someone who is stubborn, somewhat intractable so that if I didn't convince her or she was skeptical of any part of my case, she is the type of person that this may actually hang up the jury and I don't want intractable people on the jury.

THE COURT: I will accept that. What is the last one, number eight.

MR. KERN: Judge, I am going to admit I will be hard pressed to find a reason. I didn't think her responses were as ringing as I expected them to be. First of all, I didn't have as much chance to speak to these people as I might have if it wasn't 5 o'clock and you had given the instruction, "be brief" and there wasn't [sic] fifteen people to question.

THE COURT: I can always bring her out here if you want to question her?

MR. KERN: Well, I don't know if that would help out at all.

THE COURT: What was there about her answers that made you uneasy or unhappy with her?

---

4. As noted below, the trial judge later explained that the term "inappropriate" is a typographical error and should read "an appropriate." (Transcript of Hearing before Magistrate Judge Cheryl L. Pollak, 12/6/02 ("Hrg.Tr."), at 12.)

MR. KERN: Judge, I am not uneasy with her, I just am not happy with her. I don't want to lie to the Court and say I am uneasy with her because nothing she said made my [sic] uneasy. I was not happy with her and I do think she is probably about 45, 50 years old and I am trying to achieve some kind of balance and I do have middle age to elderly women on the jury and, Judge, yet the victim is a black victim.

There is no motive for me to knock black people off the jury, that is why I am a little surprised by the challenge and perhaps I am unprepared to deal with it because I don't have race in mind.

MR. SHEINBERG: All right.

THE COURT: Unhappiness ordinarily would not suffice.

The Court find's [sic] that there were certainly articulate reasons for challenging number three and number seven, I don't see the pattern has been established.

I don't find a pattern has been established with respect to number eight. Ordinarily I would not find that being unhappy with her and not as satisfied is enough if there were a pattern but in retrospect, I don't see a pattern established.

(Tr. 74–76.)

After the defense attorney struck four jurors from the first group of eight, two jurors were seated, and the second round then continued to the four jurors in the remaining six seats. (Tr. 77.) The prosecutor exercised one peremptory strike on Juror Eleven, a black woman. Juror Eleven was the only black juror remaining in the second round. Noting this fact, the defense attorney made a second *Batson* motion. (*Id.*) The trial judge denied the motion without requiring the prosecutor to articulate a race-neutral reason for the strike:

MR. SHEINBERG: I am making the same application, number eleven, Ms. Hanson is black. That is the only challenge made by the People.

THE COURT: I have not found a pattern established and I see no basis for questioning.

MR. SHEINBERG: There is a pattern established right now, the only black person is being challenged, Ms. Hanson, there are no other blacks on this jury. This Mr. Angrotta is not black.

THE COURT: No blacks on the second panel.

MR. SHEINBERG: On this selection.

THE COURT: I don't find that to be a pattern.

MR. SHEINBERG: All right, then you deny my application?

THE COURT: Sure.

(Tr. 77.)

## C. State Appeals

On April 7, 1994, DeBerry and his codefendant were convicted of second-degree murder and criminal possession of a weapon. DeBerry was sentenced to concurrent terms of imprisonment of twenty-five years to life for the murder count and five to fifteen years for the weapon possession.

DeBerry appealed his conviction to the Appellate Division in June 1996. By memorandum decision, the Appellate Division unanimously affirmed DeBerry's conviction. *People v. DeBerry*, 234 A.D.2d 470, 651 N.Y.S.2d 559 (2d Dep't 1996). After discussing the trial judge's evidentiary rulings and sentencing decision, the Appellate Division summarily disposed of the *Batson* claim and other remaining issues. *Id.* ("The defendant's remaining contentions are either unpreserved for appellate review or are without merit.") (citations

omitted). The New York Court of Appeals denied leave to appeal on February 27, 1997. *People v. DeBerry*, 89 N.Y.2d 984, 656 N.Y.S.2d 743, 678 N.E.2d 1359 (1997). DeBerry subsequently filed a § 440.10 motion, which was denied by the trial court, and leave to appeal was denied by the Appellate Division on January 28, 1998.

## II. Federal Habeas Proceedings

DeBerry filed the instant petition on April 24, 1998. In addition to the *Batson* violation, he alleged that he was not present during one day of jury selection and that certain evidentiary rulings by the trial judge denied him due process. The petition was referred to Magistrate Judge Cheryl L. Pollack for a report and recommendation.

In her first Report and Recommendation ("First Report"), Magistrate Judge Pollack concluded that the *Batson* analysis for all four challenged jurors was contrary to, and an unreasonable application of, clearly established federal law.[5] She recommended holding a hearing to expand the record and to reconstruct the thinking of the prosecutor during the jury selection portion of Petitioner's trial. This Court adopted the First Report and directed her to hold such a hearing. *DeBerry v. Portuondo*, No. 98–3323, 2002 WL 31946703, 2002 U.S. Dist. LEXIS 25181 (S.D.N.Y. Oct. 21, 2002).

The reconstruction hearing was held on December 6, 2002, eight years after DeBerry's trial. Although the Magistrate Judge's recommendation, which this Court adopted, was to further develop the record as to the prosecutor's intent in exercising his peremptory challenges, the Honorable Edward Pincus, a retired justice of the New York State Supreme Court and the presiding judge in DeBerry's trial, was the only witness. As explained more fully below, Justice Pincus testified about his general method for adjudicating *Batson* claims and attempted to explain what occurred during the proceedings in this case. Following the hearing, the Magistrate Judge issued a second Report and Recommendation ("Second Report"). In the Second Report, she concluded that, in light of the trial judge's testimony, his adjudication of DeBerry's two *Batson* challenges was not an unreasonable application of governing law and did not involve an unreasonable determination of the facts. 28 U.S.C. § 2254(d). She therefore recommended that the petition be denied.

## DISCUSSION

### I. AEDPA Standard

 Section 2254(d), as amended by the Antiterrorism and Effective Death Penalty Act (AEDPA), governs DeBerry's petition. Under this section, a habeas petition may be granted if the state court adjudication of the claim on the merits (1) "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court"; or (2) "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). For purposes of § 2254(d)(1), clearly established federal law "refers to the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." *Williams v. Taylor*, 529 U.S. 362, 412, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000).

---

**5.** The Magistrate Judge also concluded that the *Batson* claim was not procedurally barred and that DeBerry's other two claims should be rejected. This Court adopted those con-

clusions. *DeBerry v. Portuondo*, No. 98–3323, 2002 WL 31946703, 2002 U.S. Dist. LEXIS 25181 (S.D.N.Y. Oct. 21, 2002)

The Supreme Court has given independent meaning to the language in 28 U.S.C. § 2254(d)(1). *Id.* at 404–13, 120 S.Ct. 1495 (construing the "contrary to" and "unreasonable application of" clauses of § 2254(d)(1) as setting out independent bases for habeas relief). First, a state court decision may be "contrary to" clearly established federal law if "the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." *Id.* at 413, 120 S.Ct. 1495 (internal quotations omitted). Second, a state court decision may be an "unreasonable application" of Supreme Court precedent if it "identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the particular facts of the prisoner's case." *Id.* For a state court decision to be unreasonable, there must be "some increment of incorrectness beyond error," although "the increment need not be great; otherwise, habeas relief would be limited to state court decisions so far off the mark as to suggest judicial incompetence." *Francis S. v. Stone*, 221 F.3d 100, 111 (2d Cir.2000) (internal quotation marks omitted). The habeas petitioner bears the burden of showing that the state court's application of Supreme Court precedent was objectively unreasonable. *Woodford v. Visciotti*, 537 U.S. 19, 123 S.Ct. 357, 360, 154 L.Ed.2d 279 (2002).

## II. Clearly Established Federal Law

The clearly established federal law governing this case is *Batson* and the Supreme Court cases interpreting its requirements up to the date that DeBerry's conviction became final. *See Purkett v. Elem*, 514 U.S. 765, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995) (per curiam); *Hernandez v. New York*, 500 U.S. 352, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991) (plurality opinion).

*Batson* addressed the evidentiary burden that defendants faced when claiming that petit jurors were selected on the basis of race. Rejecting the "crippling" burden of proof placed on defendants by *Swain v. Alabama*, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965), the Court held that a defendant could establish a prima facie case of purposeful discrimination in the selection of the petit jury solely with reference to the prosecutor's exercise of peremptory challenges in his particular trial. *Batson*, 476 U.S. at 96, 106 S.Ct. 1712.

The Court outlined a three-step process for adjudicating claims of racial discrimination in the use of peremptory challenges. First, the defendant must make a prima face showing that the prosecutor used his challenges on the basis of race.[6] *Id.* at 96–97, 106 S.Ct. 1712. The Court did not fix with certainty the type or amount of evidence necessary to make out a prima facie case of discrimination:

> In deciding whether the defendant has made the requisite showing, the trial court should consider all relevant circumstances. For example, a "pattern" of strikes against black jurors included in the particular venire might give rise to an inference of discrimination. Similarly, the prosecutor's questions and statements during *voir dire* examination

---

6. Although Batson has since been applied to the civil context and to peremptory challenges by the defendant in a criminal case, *Georgia v. McCollum*, 505 U.S. 42, 112 S.Ct. 2348, 120 L.Ed.2d 33 (1992); *Edmonson v. Leesville Concrete Co.*, 500 U.S. 614, 111 S.Ct. 2077, 114 L.Ed.2d 660 (1991), for ease of reference, the Court will use the terms "defendant" and "prosecutor" to describe the party making the *Batson* motion and the party who exercised the peremptory challenge respectively.

and in exercising his challenges may support or refute an inference of discriminatory purpose. These examples are merely illustrative. We have confidence that trial judges, experienced in supervising *voir dire*, will be able to decide if the circumstances concerning the prosecutor's use of peremptory challenges creates a prima facie case of discrimination against black jurors.

*Id.*

■■■ Once the defendant establishes a prima facie case of discrimination, the burden shifts to the State to come forward with a neutral explanation for challenging the minority jurors. The prosecutor may not simply deny that he had a discriminatory motive or affirm his good faith. *Id.* at 97, 106 S.Ct. 1712. Rather, he must "articulate a neutral explanation related to the particular case to be tried." *Id.* at 98, 106 S.Ct. 1712. As the Court later held, the explanation does not need to be "persuasive, or even plausible," and may even be silly or superstitious, provided that it does not deny equal protection on its face. *Purkett,* 514 U.S. at 768, 115 S.Ct. 1769.

■■■ At the third and final step, "the trial court determines whether the opponent of the strike has carried his burden of proving purposeful discrimination." *Id.* At this step, the trial court's analysis will focus on the credibility of the attorney exercising the peremptory challenge. *Hernandez,* 500 U.S. at 365, 111 S.Ct. 1859 ("In the typical peremptory challenge inquiry, the decisive question will be whether counsel's race-neutral explanation for a peremptory challenge should be believed."). The trial court's determination of purposeful discrimination is a factual

finding that, on direct appeal, will be upheld if it is not clearly erroneous. *Id.* at 369, 111 S.Ct. 1859.

■■■ The third step is the heart of the *Batson* analysis. *Batson* describes it as the trial court's "*duty* to determine if the defendant has established purposeful discrimination." *Batson,* 476 U.S. at 98, 106 S.Ct. 1712 (emphasis added), and later cases use similar mandatory language. *Purkett,* 514 U.S. at 767, 115 S.Ct. 1769 ("If a race-neutral explanation is tendered, the trial court must then decide (step three) whether the opponent of the strike has proved purposeful racial discrimination."); *Hernandez,* 500 U.S. at 358, 111 S.Ct. 1859 ("[T]he trial court must determine whether the defendant has carried his burden of proving purposeful discrimination."). Consistent with these cases and illustrating the importance of determining whether the movant has met his burden, the Second Circuit has held that *Batson* requires a trial court to complete the third step of the analysis after requesting race-neutral reasons from the prosecutor.[7] *E.g., Galarza v. Keane,* 252 F.3d 630, 636 (2d Cir.2001) ("[A] trial court may not deny a *Batson* motion without determining whether it credits the race-neutral explanations for the challenged peremptory strikes."); *Jordan v. Lefevre,* 206 F.3d 196, 200 (2d Cir.2000) ("[T]he third step of the *Batson* inquiry requires a trial judge to make an ultimate determination on the issue of discriminatory intent based on all the facts and circumstances."); *see also Lewis v. Lewis,* 321 F.3d 824, 832 (9th Cir.2003) (noting the trial court's duty to determine if purposeful discrimination occurred); *McCurdy v. Montgomery Coun-*

7. A petitioner cannot win habeas relief solely by demonstrating that the state court unreasonably applied Second Circuit precedent. *Mask v. McGinnis,* 252 F.3d 85, 90 (2d Cir. 2001). Federal habeas courts, however, may look to the decisions of inferior federal courts as "helpful amplifications of Supreme Court precedent." *Matteo v. Superintendent, SCI Albion,* 171 F.3d 877, 890 (3d Cir.1999).

*ty*, 240 F.3d 512, 521 (6th Cir.2001) (same); *cf. McKinney*, 326 F.3d at 101 (reserving decision on whether clearly established Supreme Court precedent required the trial judge to make an express ruling at *Batson's* third step).

### III. The State Court Judge's Interpretation and Application of *Batson*

At the reconstruction hearing, the trial judge explained his general approach to adjudicating *Batson* motions:

A: Well, first of all the challenges had to be either race neutral, gender neutral, sexual orientation neutral, national origin neutral. And in order to be a challenge, there had to be a pattern. And my practice was if—if someone was challenged, I normally did not go into the finding [sic] a pattern first. I always let the defense counsel have the option of hearing the question or hearing my decision, hearing the District Attorney and still preserving his right to claim that there was a pattern.

. . .

Q: Now, when the *Batson* challenge was made, why is it that you asked Mr. Kern to state his reason?

A: Because that is my practice. If challenges are raised, I don't like to keep the defense counsel in the dark. And suppose I found no pattern, then the defense counsel wouldn't hear the District Attorney's reasons, wouldn't get a chance to challenge. So I believe in getting the reasons out first, hear what they both had to say and defense counsel still had the right to claim pattern. And, of course, the District Attorney had a right to challenge or· insist that there was no pattern.

(Hrg. Tr. 5, 9.)

As this explanation indicates, the trial judge's general procedure was to proceed to step two of the *Batson* process by ask-

ing for race-neutral reasons immediately after a question was raised about the propriety of the strike. After the reasons were offered, the defense counsel still would have the opportunity to claim a "pattern" existed, which the prosecutor could dispute, and presumably the trial judge would make the final decision on whether a "pattern" was established. The trial judge's approach reverses the *Batson* process, in which a pattern of strikes against minority jurors is an illustrative example of the means by which the defendant may demonstrate a prima facie case of discrimination, a finding that should precede a request for race-neutral reasons. *Batson*, 476 U.S. at 96–97, 106 S.Ct. 1712; *see also Central Ala. Fair Hous. Ctr., Inc. v. Lowder Realty Co.*, 236 F.3d 629, 636 (11th Cir.2000) ("As [the *Batson* ] framework makes clear, the establishment of a prima facie case is an absolute precondition to further inquiry into the motivation behind the challenged strike."); *United States v. Alvarado*, 923 F.2d 253, 255 (2d Cir.1991) ("[T]he initial question is whether appellants presented a prima facie case sufficient to require explanations; that determination must be made before the explanations are considered."). As explained in more detail below, however, the trial judge's use of the term "pattern" is ambiguous. At times the trial judge appears to use "pattern" to refer to a sequence of challenges and at times to refer to a single attempt to challenge for reasons of race. (*Compare* Hrg. Tr. 5, 9, 21 *with id.* at 51.) Therefore, before concluding whether the state court decisions were contrary to, or unreasonable applications of, the *Batson* rule, as directed by AEDPA, this Court must turn to the treatment of the individual jurors in this case.

### A. Juror Three

▮ The defendant's first *Batson* motion followed peremptory challenges to

three jurors, the second group of three black jurors struck by the prosecutor. After the motion was made, a short colloquy on the number of black jurors who had been challenged in the first and second round followed, and the trial judge apparently concluded that an inference of discrimination had been established sufficient to require race-neutral explanations. The trial judge then asked for a race-neutral reason for the peremptory challenge to the first juror. The prosecutor cited the similarity between Juror Three's age and the age of the defendant. At the time of voir dire, the trial judge appeared to credit the prosecutor's reason. He recalled a statement by Juror Three about relating to the young defendants and concluded "I find that to be inappropriate [sic] challenge." (Tr. 74.)

The trial judge's testimony at the reconstruction hearing confirms that he reached step three of the *Batson* protocol. The trial judge emphasized that he found the prosecutor to be "entirely credible" and stated that the transcript should read "an appropriate" rather than "inappropriate." (Hrg. Tr. 12–13.)

We agree with the Magistrate Judge that the trial judge adequately completed the *Batson* process with regard to Juror Three. First, the colloquy regarding the number of jurors challenged by the prosecutor in the first and second rounds indicates that the trial judge was ensuring that the defendant had shown a prima facie case sufficient to require further inquiry. After confirming the number of black jurors who had been challenged, the trial judge then proceeded to the second step of *Batson* by asking for a race-neutral reason for challenging Juror Three. Finally, as illuminated by the hearing testimony, the trial judge reached the third step of *Batson* by finding that the challenge to Juror Three was appropriate.

Noting that the prosecutor did not challenge other non-black, young jurors, DeBerry argues that the trial court erred by accepting the prosecutor's reason for striking Juror Three. (Def.Supp.Memo.14–15.) Given the statements during jury selection and the hearing, however, the Court concludes that the trial judge did not unreasonably apply federal law when he accepted the prosecutor's reasons for striking Juror Three.

## B. Juror Seven

 Before asking for a race-neutral reason for striking Juror Seven, the prosecutor began to protest the sufficiency of defendant's prima facie case. The trial judge, however, cut him off: "Well if they are three black people this round, I didn't take note on the last round.... Rather than waste time, I will ask to have the reason now." (Tr. 74.) The prosecutor cited Juror Seven's law enforcement background and her apparent "stubborn" and "intractable" demeanor. The trial judge responded with the simple statement "I will accept that." (Tr. 74–75.)

Focusing on the ambiguity of the phrase "I will accept that," the Magistrate Judge concluded in the First Report, and this Court agreed, that the trial judge failed explicitly to adjudicate the credibility of the prosecutor's race-neutral reason for the strike, as required by the third step of *Batson*. At the reconstruction hearing, however, the trial judge testified that he did in fact make the relevant finding: "I said 'I accept that,' meaning that I accepted it as credible, race-neutral.... It was a credible, reasonable statement on his part, race neutral, no prejudice." (Hrg. Tr. 16.)

The Magistrate Judge found the witness to be credible, and we agree that his treatment of Juror Seven does not provide a basis for habeas relief. Although a trial judge must reach step three of *Batson*, no

controlling Supreme Court precedent requires the trial judge's adjudication to take any particular form or include any "magic words." *Galarza*, 252 F.3d at 640 n. 10. Here, the trial judge's statement indicated his acceptance of the prosecutor's explanation, and he immediately moved on to the inquiry regarding Juror Eight. Taking into account the entire context of voir dire, and in light of his testimony at the hearing, the trial judge completed *Batson's* second and third steps by requesting a race-neutral explanation and then determining whether the defendant had shown an intent to discriminate by accepting the challenge. No clearly established federal law required him to go further. *See McKinney*, 326 F.3d at 99. DeBerry has not met his burden of showing that the trial judge's treatment of the *Batson* challenge with regard to Juror Seven, and the Appellate Division's later approval of that treatment, was an unreasonable application of federal law.

### C. Juror Eight

██ As the above-quoted colloquy from jury selection attests, the prosecutor struggled to proffer a race-neutral reason for striking Juror Eight. He admitted that he was hard pressed to find a reason for striking the juror and complained about the amount of time provided the attorneys for questioning. Offered the chance to examine Juror Eight again, however, the prosecutor declined. He then reiterated his unhappiness with Juror Eight and added an assurance that his strikes were not racially motivated:

> Judge, I am not uneasy with her, I just am not happy with her. I don't want to lie to the Court and say I am uneasy with her because nothing she said made my [sic] uneasy. I was not happy with her and I do think she is probably about 45, 50 years old and I am trying to achieve some kind of balance

and I do have middle age to elderly women on the jury and, Judge, yet the victim is a black victim.

> There is no motive for me to knock black people off the jury, that is why I am a little surprised by the challenge and perhaps I am unprepared to deal with it because I don't have race in mind.

(Tr. 75.)

The trial judge noted the insufficiency of the prosecutor's explanation in the ordinary case, but nevertheless upheld the challenge:

> Unhappiness ordinarily would not suffice.

> The Court find's [sic] that there were certainly articulate reasons for challenging number three and number seven, I don't see the pattern has been established.

> I don't find a pattern has been established with respect to number eight. Ordinarily I would not find that being unhappy with her and not as satisfied is enough if there were a pattern but in retrospect, I don't see a pattern established.

(Tr. 75–76.)

Although not evident from the voir dire transcript, the trial judge's hearing testimony confirms that he had found the prosecutor to be credible. The trial judge responded "Yes" when asked if he found the prosecutor's explanation to be "truthful as race neutral." (Hrg. Tr. 21.) When the defense attorney questioned whether he rejected the challenge to Juror Eight "because you found credible Mr. Kern's explanation," the trial judge responded "Factually credible, yes." (Hrg. Tr. 51.) He also stated that he would not accept a peremptory strike, even outside of *Batson*, if the

proffered reason was "false, phony or not credible." (*Id.*)

At the hearing, the trial judge also confirmed that he understood and applied the relevant principles by which *Batson* challenges are resolved. As the Supreme Court has emphasized, the ultimate end of the *Batson* inquiry is whether the person opposing the challenge has met his burden of proof in proving purposeful discrimination, a question that will typically be resolved by examining the credibility of the prosecutor. *Purkett,* 514 U.S. at 768–69, 115 S.Ct. 1769; *Hernandez,* 500 U.S. at 365–70, 111 S.Ct. 1859. In the present case, the trial judge stated that he would not have allowed the challenge to Juror Eight if he did not believe the prosecutor, if he felt there was a "Batson situation," or if he believed that the prosecutor challenged Juror Eight for racial reasons. (Hrg. Tr. 22, 51, 59.) By focusing on the credibility of the prosecutor and the overall question of whether the prosecutor's peremptory challenges were motivated by race, the trial judge's hearing testimony confirms that he adjudicated the *Batson* motion in reasonable accordance with the holdings announced by the Supreme Court in *Batson* and its progeny.

This is a close case because, at the time of voir dire, the trial judge's finding with regard to Juror Eight appeared to depend on the outcome of the previous two challenges rather than the persuasiveness of the prosecutor's explanation for striking Juror Eight. Although this Court may have resolved the issue differently were this a direct appeal rather than a habeas petition in which credibility issues are critical, the trial judge's decision to accept a questionable explanation after receiving two previous credible, race-neutral explanations is not an unreasonable application of *Batson*. In undertaking the sensitive inquiry into the state of mind of the prose-

cutor, as in deciding whether the defendant initially raised a prima facie case of discrimination, the trial judge was in the best position to examine all circumstances and evidence relevant to the prosecutor's intent, including his ability to explain the previous challenges. *Hernandez,* 500 U.S. at 365, 111 S.Ct. 1859; *see United States v. Alvarado,* 951 F.2d 22, 26 (2d Cir.1991) (noting that, in assessing all the circumstances relevant to prosecutorial intent, the trial judge may determine that "sound explanations dispel the doubt raised by a questionable one"). In this case, in addition to the prosecutor's explanation, the evidence before the trial judge included the demeanor of the prosecutor during voir dire and when exercising the challenge, the acceptance of at least one black juror during the first round (Tr. 72), and the credible explanations for challenging the previous two jurors. *Hernandez,* 500 U.S. at 369–70, 111 S.Ct. 1859 (explaining that the trial judge was entitled to rely on similar factors at *Batson's* third step). By referring to the insufficiency of the prosecutor's explanation in the ordinary case, but accepting the challenge based on the absence of an established "pattern" in this case, the trial judge in essence concluded that, in light of all the facts and circumstances, the prosecutor had rebutted any inference of discrimination. Given the substantial discretion afforded by *Batson* to trial judges in supervision of voir dire, *Batson,* 476 U.S. at 96, 106 S.Ct. 1712, this Court is not disposed to disturb this factual finding.

In circumstances such as these, a clearer explanation of the aggregate circumstances forming the basis for the court's ruling would further the ends of *Batson* and make possible more meaningful review of the trial judge's decision. In light of the deference afforded state courts by § 2254, however, this Court does not conclude that the trial judge's actions were

unreasonable. *See McKinney,* 326 F.3d at 100 ("Although reviewing courts might have preferred the trial court to provide express reasons for each credibility determination, no clearly established federal law required the trial court to do so."). The Court therefore agrees with the Magistrate Judge that the trial judge's actions when adjudicating the challenge to Juror Eight, while unorthodox, were not objectively unreasonable as required by § 2554.

### D. Juror Eleven

DeBerry's counsel made a second *Batson* motion after the prosecutor exercised his next peremptory challenge against Juror Eleven—the only remaining black juror in the second round and the seventh strike in a row (out of his first seven strikes) against a black juror.[8] The trial judge cited his previous finding of the lack of a pattern to deny the second *Batson* motion at the first step. (Tr. 78 ("I have not found a pattern established and I see no basis for questioning.").) Relying primarily on the deferential review of a state court's decision at *Batson*'s first step when the sole evidence supporting a prima facie case is a statistical pattern of strikes, the Magistrate Judge concluded that the trial judge did not apply federal law unreasonably when he declined to question the prosecutor further about his strike of Juror Eleven. We agree.

As an initial matter, the trial judge's decision is entitled to substantial deference. In *Batson,* the Supreme Court did not set a precise threshold to govern when a prima facie case has been established.

Rather, the Court directed trial courts to examine "all relevant circumstances" and expressly afforded substantial discretion to trial judges in deciding when a prima facie case had been established. *Batson,* 476 U.S. at 96–97, 106 S.Ct. 1712. In addition, as mandated by § 2554, this Court must be satisfied that the trial judge's application of *Batson* was not merely erroneous, but was objectively unreasonable. *Lockyer v. Andrade,* —— U.S. ——, 123 S.Ct. 1166, 155 L.Ed.2d 144, 158 (2003). As a result, both *Batson* and federal habeas jurisprudence significantly limit the scope of this Court's review.

The Second Circuit recently discussed the application of AEDPA when reviewing a state court's termination of the *Batson* inquiry at the first step. *Overton v. Newton,* 295 F.3d 270 (2d Cir.2002). In *Overton,* the trial judge was faced with a *Batson* motion midway through the jury selection process, which relied on the pattern of the prosecutor's strikes against black jurors. The prosecutor used two of his first four peremptory challenges to strike two out of the first five black jurors in the first round. In the second round, the prosecutor used five of his six peremptory challenges to strike the remaining five black jurors. Thus, the prosecutor used 70% of his strikes against prospective black jurors when the panel when 34% of black venirepersons made up the panel. *Id.* at 274–75. The trial judge rejected both *Batson* motions[9] at the first step.

The Second Circuit reversed the district court's grant of the habeas petition. The

---

8. Although no one challenged the defense attorney's characterization of Juror Eleven as the only black person remaining in the second round, there was some dispute at the reconstruction hearing whether Juror Twelve was also black. (Hrg. Tr. 22.) It is more likely that Juror Twelve was Hispanic. His name

was Miguel Angrotta (or Anglotta), and the defense attorney later explained his reason for striking Juror Twelve by citing Mr. Angrotta's "problem with the language." (Tr. 79–80.)

9. The prosecutor had also made a reverse-*Batson* motion.

court concluded that statistics alone can be sufficient to establish the requisite prima facie showing in appropriate circumstances. *Id.* at 278. The Second Circuit held, however, that the state judge did not unreasonably apply *Batson* under AEDPA's deferential standard when it failed to find a prima facie of discrimination on the facts before her. *Id.* at 279–80.

Although the question is again close, this Court finds *Overton* persuasive and concludes that the trial judge reasonably applied *Batson*'s first step when he denied DeBerry's second motion. The trial judge properly adjudicated the first *Batson* motion and found that the prior challenges did not violate the Constitution. This conclusion, in addition to the other facts particularly available to the trial judge at the time of jury selection,[10] was relevant to whether the defendant has put forth evidence sufficient to raise an inference of discrimination. In this context, it was not objectively unreasonable for the trial judge to conclude that any inference of discrimination had been dispelled and that the strike of an additional black juror was insufficient to require further inquiry.

## CONCLUSION

The petition for a writ of habeas corpus is denied. Because the Petitioner has shown the substantial probability of a denial of a constitutional right, a certificate of appealability will issue. 28 U.S.C. § 2253(c).

SO ORDERED

---

**10.** The trial judge testified that all counsel in the case were experienced and well known to him, and that he accepted as credible the prosecutor's statement that race was not a factor which concerned him in this case in which both the defendant and victim were black.